**Rhonda M. KRISS, Appellee/Cross–Appellant,**

v.

**SPRINT COMMUNICATIONS COMPANY, LIMITED PARTNERSHIP, Appellant/Cross–Appellee.**

Nos. 94–2815, 94–2906.

United States Court of Appeals, Eighth Circuit.

Submitted May 15, 1995.

Decided July 3, 1995.

Larry Shumaker, Kansas City, MO, argued, for appellant.

Susan M. Robiner, Minneapolis, MN, argued (Kathleen M. Graham and Daniel Oberdorfer, on the brief), for appellee.

Before WOLLMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and BOGUE, Senior District Judge.*

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Sprint Communications Company decided not to transfer sales representative Rhonda Kriss to the New Business Management Group (new BMG) in September, 1990. Kriss sued Sprint for gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Minnesota Human Rights Act, Minn.Stat. § 363.03. After a bench trial, the district court made findings of fact that Kriss's supervisor, Scott Miller, had a "discriminatory attitude," and had injected this attitude into the decision-making process which denied Kriss the transfer she wanted. While the court concluded that Kriss had proven her claim of gender discrimination, and accordingly awarded damages and penalties under Title VII and the Human Rights Act (including attorney's fees and costs), it rejected her claim of constructive discharge. (The district court's opinion is published at 851 F.Supp. 1350 (D.Minn.1994)).

Sprint has appealed the district court's findings of liability, damages, and attorney's fees. Kriss has cross-appealed on the issue

* The HONORABLE ANDREW W. BOGUE, United States Senior District Judge, for the District of South Dakota, sitting by designation.

of constructive discharge. For reasons explained below, we reverse the finding of liability against Sprint and affirm the finding on constructive discharge.

## I.

Prior to September 1990, Sprint's sales force was divided into two distinct groups: the National Accounts Division (NAD), which sold to customers that billed over $100,000 per month; and the Business Market Group (BMG) which sold to customers that billed under $100,000. Just prior to reorganization, Margie Bingham was manager of NAD and reported to the Regional Director, Marilyn Deas. Ryan Sothan was the manager of BMG, and Scott Miller and Jay Anders each managed a group of sales representatives in BMG. Kriss worked as a sales representative for Scott Miller, who had hired her. 851 F.Supp. at 1352.

Kriss performed well above her assigned sales quotas. While she attained outstanding sales numbers, she also experienced problems in servicing and maintaining her accounts after the sale. Some of these problems were attributed to internal billing problems which plagued Sprint at that time. On the other hand, Kriss was responsible for creating a number of her own problems, including not filling out phone numbers correctly on order forms and miscommunicating with customers. Other customers, however, praised her responsiveness. 851 F.Supp. at 1352–53.

The district court made certain findings regarding Miller, Kriss's supervisor, without alluding to any particular incidents or testimony: Miller was not as supportive of Kriss as he was of male representatives; he was less available to women representatives in both professional and social settings; support staff resources were unequally distributed between Kriss and male representatives; support staff were unavailable when Kriss sought them; and Miller had a poor record of retaining women sales representatives. 851 F.Supp. at 1353. The court found that Miller contributed to a male-dominated atmosphere in the workplace by discussing sports with men but not women, and by inviting the "Tie Lady," "a woman that worked at a men's clothing retailer, [to] bring samples of ties into sales meetings...." 851 F.Supp. at 1353–54. Also, Miller once "offered as a sales incentive a gift certificate for a men's clothing store." 851 F.Supp. at 1354. According to the district court, Miller's comments showed "a stereotypical attitude toward the roles of men and women." *Id.* He once said, for instance, that certain of his sales representatives were not ready to "run with the stallions." *Id.* There was also testimony that he made "evaluative comments" about the physical appearance of women in the office. *Id.*

In February 1990, an incident involving an account known as The Roach Organization (TRO) became the defining moment for Kriss in the eyes of some at Sprint. The TRO story is a tale of missed communications and hurt feelings that is well recounted at length in the district court's opinion. 851 F.Supp. at 1354–55. Obtaining the TRO account required placing orders with, and using the staff of, the NAD. Because of the misunderstandings that occurred, the NAD staff, and especially its manager Margie Bingham, came away with a poor impression of Kriss.

In September 1990, Sprint reorganized its sales force into three groups: the NAD would retain accounts over $100,000; the "New BMG" would still sell to customers with billings over $10,000, but now the emphasis would be on service and expanding the billings of existing customers; the National Sales Division (NSD) would focus on sales to new customers with billings under $10,000 per month.

In the spring of 1990, Sprint management began to decide who would move from the old BMG to the new BMG and who would move to the NSD. Marilyn Deas asked Margie Bingham to identify representatives to transfer. Deas had the final decision, but intended to rely on Bingham's recommendation. Because Bingham was in the NAD, she would depend heavily on the recommendations of the managers in the BMG, namely Miller, Anders, and Sothan. Bingham held a series of meetings with Miller and Anders, which Sothan sometimes attended.

Bingham began the process by stating that there were three representatives she would not consider for transfer to the new BMG. One of them was Kriss. Bingham had a bad

impression of Kriss from the TRO incident. Bingham testified that if Miller had pushed for Kriss, she would have been willing to enter the debate and examine Kriss's personnel file and performance reviews. Miller did not raise any objection to Kriss being excluded. The district court faulted Miller's silence. "He did not point out her superior sales performance or awards that would have reflected favorably on Kriss. At the same time, he withheld negative information about the male representatives." 851 F.Supp. at 1356. The five chosen for the new BMG were all men. Kriss was assigned to the NSD, and was disappointed in not having been chosen to the new BMG. On December 6, 1990, after making significant contributions in the NSD, Kriss submitted her resignation.

In making its conclusions of law, the district court decided that Sprint was liable for gender discrimination for failing to transfer Kriss to the new BMG. Under *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the plaintiff must show that gender was a motivating factor in the employment decision. If plaintiff makes such a showing, the burden shifts to the employer to show that it would have made the same decision even if it had not taken the illegitimate criteria into account. Under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the plaintiff must present a prima facie case of discrimination. If the plaintiff makes such a showing, then the defendant must rebut the prima facie case by producing a non-discriminatory reason for the decision. If defendant produces such a reason, then the plaintiff must prove that the proffered reason is pretextual. The district court chose to rely upon *Price Waterhouse,* but opined that the result would have been the same under *McDonnell Douglas.* 851 F.Supp. at 1357, 1359 n. 5.

The district court found that Miller was closely involved in the decision-making process, and that the evidence of his discriminatory attitude made it more likely than not that gender was a motivating factor in the decision not to transfer Kriss. The district court concluded that the evidence showed that Miller had a "discriminatory animus" toward women in general. The district court then used this observation to explain Kriss's problems as a result of the TRO incident and Bingham's failure to choose Kriss for the new BMG. The court faulted Miller for not doing enough to support Kriss in the TRO incident and concluded that Bingham's poor perception of Kriss in the TRO incident was a result of Miller's sexism. The court also faulted Miller for failing to argue for Kriss after Bingham had stated that she would not be considered, and for failing to raise negative information about the male candidates. Miller's "influence on the decision making process makes it more likely than not that his discriminatory attitude was a motivating factor in this decision." 851 F.Supp. at 1358–59.

The district court rejected Sprint's attempt to rebut Kriss's allegations of discrimination. "Once a plaintiff has shown that a discriminatory animus was a motivating factor in the decision making process, defendant may avoid liability only if it can prove by a preponderance of the evidence that it would have made the same decision even if the illegitimate criterion had not been taken into account." 851 F.Supp. at 1359 (citing *Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. at 1794–95). Sprint argued that regardless of any discriminatory attitude Miller might have had, Bingham would have made the same decision because of her perceptions of Kriss in the TRO incident. The district court disagreed, concluding that Bingham's decision "could easily have been different." 851 F.Supp. at 1359. Sprint failed to show, the court ruled, that the same decision would have been made without Miller's injection of a discriminatory animus into the new BMG selection process. Accordingly, the court held that Kriss had proved her failure-to-promote claim under Title VII and the Minnesota Human Rights Act.

## II.

### A.

■ We may reverse the district court's factual findings of intentional discrimination only if, after a review of the entire record, we

have been left with a firm and definite conviction that a mistake has been committed. *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). In this regard, a number of the district court's findings of fact trouble us.

■ 1. The district court found that Miller contributed to a "male-dominated atmosphere" in the workplace because he (a) discussed sports with men at work, (b) apparently invited the "Tie Lady" to display her wares in the offices, and (c) offered "a gift certificate for a men's clothing store" as a sales incentive. 851 F.Supp. at 1353–54. After reviewing the testimony, we do not find these items of evidence probative of gender discrimination. For example, we do not think that discussing sports with men and women, or one or the other, should be taken as indicative of character any more than talking about the weather. (At oral argument, moreover, plaintiff's counsel opined that women preferred to talk about their children.) Such discussions should certainly not be taken as indicative of gender discrimination.

The "Tie Lady" and the gift certificate also fail to demonstrate a "male-dominated atmosphere." The "Tie Lady" did not bring "samples of ties into sales meetings," 851 F.Supp. at 1354, but displayed silk ties for sale in a conference room where people were invited to come in and purchase them. T. 118 (testimony of Kriss). While the district court found that the certificate was "a gift certificate for a men's clothing store," 851 F.Supp. at 1354, 1358, the evidence instead showed that it was an American Express certificate that Miller merely suggested be spent at that store. T. 118 (testimony of Kriss). We reject the idea that the foregoing facts provide evidence of a "male-dominated atmosphere."

■ 2. The district court found that Miller had a "stereotypical attitude" because he said on one occasion that certain sales representatives were not ready to "run with the stallions," and that Miller made certain "evaluative comments about the physical appearance of women in the office." 851 F.Supp. at 1354. Upon reflection and closer review, we believe that this evidence deserved little or

no credit. The comment about running with the stallions concerned two sales representatives, one man and one woman, whose performances Miller thought inferior to the other sales representatives on his team. T. 121 (testimony of Kriss). The "stallions" were representatives on his sales team who had performed well, including Kriss. *Id.* Although the term has gender connotations, Miller's use of the term "stallions" in this context appears to us to be innocent.

■ Evidence of Miller's "evaluative comments" appear to be the following: (a) he stated that a high-ranking female manager was "ugly" (T. 265); (b) he stated that a woman in the office was a "bitch" (T. 265); and (c) he joked that he wanted to hire a sales representative away from a California Sprint office because she was attractive (T. 267). While these comments are rude, they do not furnish much proof of gender discrimination. Calling a particular person ugly or using an epithet characterizing a person as unpleasant is not particularly probative of whether someone would refuse to promote someone else for improper reasons. Specifically, the word "bitch," it seems to us, is not an indication of a general misogynist attitude. Rather, it is a crude, gender-specific vulgarity, which in this case was directed toward only one woman, rather than women in general. (We note the existence of many vulgar epithets that are used only of men that, we believe, would not be indicative of animus against males.) Hence, we do not find Miller's use of this term to be particularly probative of gender discrimination. Perhaps if the evidence were that Miller regularly used the word "bitch" as a synonym for "complain," the plaintiff's case would be stronger; because that would furnish some evidence that Miller associated complaining with females. But that is not our case. The joking remark about hiring the sales representative likewise deserves little credit in proving that Miller improperly discriminated against Kriss.

■ 3. The district court found gender discrimination because support staff were unequally distributed between male sales representatives and Kriss, and were often unavail-

able when Kriss sought them. 851 F.Supp. at 1353. These findings pass over evidence that many support staff thought Kriss created her own problems and that they wanted to avoid her. T. 508–09, 553–54, 556, 663–64, 918–19, 974–75, 1051. While the district court seemed to think that support staff distribution was somehow a matter of gender discrimination, much evidence suggests otherwise.

■ 4. The district court found that Miller had a poor record of retaining women sales representatives because, of the four women who were on his team, none was promoted and all have left the company. 851 F.Supp. at 1353. The following, however, appears to be uncontroverted: three left the company after Miller no longer supervised them; one resigned in lieu of being fired and Miller in fact fired another, both for failure to meet their performance quotas, T. 984, 1136; another resigned when her husband was transferred to Arizona. T. 1134. We do not find this evidence probative of a sex-based animus on Miller's part. The district court, moreover, gave Miller no credit for hiring each of these women, including the plaintiff, as well as attempting to recruit other women within the company as sales representatives, T. 964, 1055, evidence at odds with his purportedly sexist nature.

■ 5. The district court saw the TRO incident as evidence that Miller's supposed "discriminatory animus" worked to undermine Kriss in the eyes of decision-makers such as Bingham. The district court emphasized that Miller's discriminatory attitude, not a simple breakdown of communications, caused Bingham to blame Kriss for the problems surrounding TRO, because Miller did not do enough to remedy the problems that had arisen. In other words, once Miller's sexist attitude was accepted as a fact, it then explained Miller's failure to intervene, explain, and accept blame on Kriss's behalf in TRO; the TRO incident, in turn, further reflected Miller's sexist intent because it showed his lack of support. 851 F.Supp. at 1358. While it may be that Miller, as Kriss's supervisor, could have done more to help Kriss in that difficult situation, we do not

accept that this furnishes much evidence of gender bias.

In short, we find the evidence of gender bias to be thin and at best highly equivocal. After reviewing it, we are left with a firm and definite conviction that the district court made a mistake.

### B.

■ We therefore find that the district court's application of *Price Waterhouse* was error. Kriss presented insufficient evidence of "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the factfinder to find that that attitude was more likely than not a motivating factor in the employer's decision." *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 449 (8th Cir.1993) (quoting *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir.1992)); *accord Sargent v. Paul,* 16 F.3d 946, 948 (8th Cir.1994) (plaintiff must produce direct evidence showing a causal connection in order to qualify for application of *Price Waterhouse*); *Stacks v. Southwestern Bell Yellow Pages, Inc.,* 996 F.2d 200, 201 n. 1 (8th Cir.1993) ("direct evidence" in the context of *Price Waterhouse* means evidence "sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the challenged decision"). Even assuming that Miller made the remarks attributed to him, as we did in our analysis above, (and he denied making them), they do not necessarily reflect a discriminatory attitude, and constitute little more than "stray remarks in the workplace" and "statements by decisionmakers unrelated to the decisional process itself." *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. at 1804 (O'Connor, J., concurring). Kriss thus failed to present direct evidence that Miller, or anyone else, intentionally undermined her candidacy for reasons of gender. Thus, Kriss's evidence did not justify application of *Price Waterhouse.*

### C.

■ Nor would an application of the criteria set out in *McDonnell Douglas* have

availed the plaintiff. The district court discussed *McDonnell Douglas* in a footnote:

> Plaintiff has established a prima facie case of discrimination because she is a member of a protected class, she was qualified for a position in the New BMG, she was denied the position, and the position was awarded to non protected class members. Sprint's articulated non-discriminatory reason for its failure to transfer Kriss is that it was Margie Bingham's decision, not Scott Miller's. ... Scott Miller's significant role in the selection process and Bingham's heavy reliance on the input of Miller and Anders, renders the proffered reason pretextual.

851 F.Supp. at 1359 n. 5. Regarding Bingham's role, the district court, applying *Price Waterhouse*, emphasized that Sprint failed to carry its burden of proving that Bingham would have reached the same decision absent the presence of an illegitimate motive. In the opinion of the district court, (1) if Miller had pushed for Kriss, (2) if Bingham had entered the debate, (3) if Bingham had looked at Kriss's sales figures, and (4) if Miller had raised negative information in other candidates files, then "Bingham may well have chosen Kriss for the new BMG." 851 F.Supp. at 1359.

With respect, assuming the applicability of a *McDonnell Douglas* analysis under which the plaintiff has the burden of proof, the above analysis is entirely too speculative to convince us that Bingham would have changed her mind. Bingham wrote to Miller after the TRO debacle that she was "absolutely outraged" at how Kriss had treated Bingham's staff, and that "going forward I will most likely not agree to support any of [Kriss's] efforts." Appellant's Br., Add. 4. Bingham herself cut off any consideration of Kriss for the new BMG. Bingham, moreover, might have "entered the debate," but she did not testify that she would have chosen Kriss. The district court opined that Bingham might have chosen Kriss, despite the negatives in her personnel file, if Bingham had known about negative material in the other candidates' files. 851 F.Supp. at 1359. The only negative information to which the district court referred, however, is that Miller "did not inform Bingham of the

negative action taken against Jim Lysinger for signing on behalf of the customer on certain Sprint forms." 851 F.Supp. at 1358. As it turns out, Larry Fisher (not Jim Lysinger) was reprimanded for signing on a customer's behalf in order to reserve certain telephone numbers, but Kriss admitted that she engaged in the same conduct. T. 1334. At any rate, Miller should not have been charged with a duty to advance Kriss's candidacy and to undermine the other candidates, especially after Bingham stated that Kriss would not be considered. Kriss's evidence thus falls short of making a showing under *McDonnell Douglas,* because without evidence of Miller's sexism and proof that his sexism had caused the decision not to transfer Kriss, Bingham's reasons for denying Kriss's transfer cannot fairly be characterized as a pretext.

Upon a careful review of the evidence, we believe that this record could not reasonably support a finding of gender discrimination in violation of Title VII by a preponderance under the *McDonnell Douglas* standard. Kriss therefore also failed to carry her burden under the Minnesota Human Rights Act. *Sigurdson v. Isanti County,* 386 N.W.2d 715, 719–20 (Minn.1986) (*McDonnell Douglas* standards apply under the Minnesota Human Rights Act). Sprint made a business decision, however imperfect, possibly corrupted by poor communications, false impressions, and lack of careful study and debate, that does not appear to us to have been tainted by gender discrimination. We therefore reverse the finding of liability against Sprint.

### III.

 Kriss argued below that her resignation from Sprint in December 1990 was a constructive discharge because she was embarrassed and humiliated at not having been selected to the New BMG, and that she had no possibility for future advancement within Sprint. The district court found that the evidence did not support her contentions. 851 F.Supp. at 1359–60. Constructive discharge requires that a plaintiff show that the resignation was a reasonably foreseeable consequence of the employer's discriminatory actions. *Hukkanen v. Int'l Union of Operat-*

*ing Engineers,* 3 F.3d 281, 285 (8th Cir.1993). Kriss's constructive discharge claim is moot because we have denied her claim of discrimination. We therefore affirm on the cross-appeal.

### IV.

For the foregoing reasons, the judgment of the district court is reversed as to the appeal, and affirmed as to the cross-appeal.