**Toni LEITING, Plaintiff,**

v.

**GOODYEAR TIRE & RUBBER COMPANY, Defendant.**

No. 4:99CV3092.

United States District Court, D. Nebraska.

Oct. 25, 2000.

· David A. Domina, Pamela J. Dahlquist, Domina Law Office, Omaha, NE, for Plaintiff.

Robert B. Evnen, Krista L. Kester, Shannon L. Doering, Craig W. Strong, Woods, Aitken Law Firm, Lincoln, NE, for Defendant.

## MEMORANDUM AND ORDER

KOPF, Chief Judge.

This matter is before the court on the defendant's motion for summary judgment (filing 51). Upon careful consideration of the pleadings, filed affidavits, and briefs submitted by the parties, I find that the motion should be granted.[1]

### I. BACKGROUND

This is an employment discrimination case brought pursuant to the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e to 2000e–17, the Civil Rights Act of 1886 (Section 1981), 42 U.S.C. § 1981, and the Nebraska Fair Employment Practice Act (FEPA), Neb.Rev.Stat. §§ 48–1101 to 48–1125. All three "causes of action" are based on the same factual allegations, as set forth in paragraphs 3 through 10 of the plaintiff's complaint (filing 1):

3. The plaintiff at all times hereinafter mentioned was employed by The Goodyear Tire and Rubber Company at it's (sic) location in Lincoln, NE.

4. At all times, hereinafter mentioned, the defendant employed one thousand or more employees within the meaning of 42 U.S.C. § 1981a.

5. That the plaintiff as (sic) harassed because of her gender by a male coworker who was Black; that effective steps were not taken to control the harassment;

6. That after the plaintiff complained about the black co-worker, that coworker made untruthful accusations against the plaitniff (sic); the plaintiff was disciplined despite the fact that the allegation was untrue; the defendant gave deference to the story given by the Black coworker because of his race;

7. That when the allegation of the black coworker was proven to be false, the defendant did not pay the plaintiff for the wasges (sic) she was forced to lose when the discipline was imposed;

8. That the plaintiff was forced to take a job layoff in order to keep away from the harassing coworker and ultimately took a less attractive job in order to keep away from him because the defendant would not take effective steps to control the harassment;

9. As a direct result and proximate cause of the Defendant's actions, the Plaintiff has suffered lost wages and lost benefits.

10. As a further and direct result of Defendant's actions, the Plaintiff has suffered undue hardship, great emotional distress, humiliation, and inconvenience, loss of enjoyment of life, and mental anguish.

The foregoing allegations involve two distinct types of claims: (1) a hostile work

---

1. Also pending before the court, with reference to the summary judgment motion, are the defendant's motion for leave to file a supplemental brief (filing 89) and the defendant's motion for leave to file original declaration (filing 90). Both of those motions will be granted instanter.

environment claim, based upon the alleged sexual harassment of the plaintiff by a co-worker; and (2) a reverse racial discrimination claim, based upon the disciplinary action that was taken against the plaintiff. Regarding the first claim, the plaintiff, Toni Leiting (Leiting), who is a Caucasian female, contends that her co-worker, Richard "Johnny" Brown ("Brown"), who is an African–American male, beginning in May 1997, stared at her, sometimes while reading pornographic magazines, and made inappropriate gestures and remarks. The second claim concerns the fact that Leiting was suspended from work for seven days in September 1997, after allegedly making a racial slur about Brown. At the final pretrial conference that was held on September 27, 2000, however, Leiting attempted to expand upon both of these claims.

As listed in the order on final pretrial conference (filing 92), Leiting's hostile work environment claim purportedly involves the following controverted issues:

a. Was the Plaintiff subjected to a hostile work environment permitting pornography to be displayed and used and permitting Plaintiff to be accosted by it?

b. Was this conduct based on the Plaintiff's sex or gender?

c. Was the pornography being used and displayed unwelcome by the plaintiff?

d. Was the pornography and the work environment created by the pornography sufficiently severe or pervasive that a reasonable person in the Plaintiff's position would have found the work environment hostile?

e. At the time the conduct was occurring and as a result of the conduct, did the Plaintiff, in fact, believe that her work environment was hostile or abusive?

f. Did Goodyear know or should it have known pornographic materials and sexually hostile behaviors associated with these materials were in active use and present in the plaintiff's work environment in Goodyear's Lincoln, Nebraska plant?

g. Did Goodyear fail to take prompt and appropriate corrective action to end the sexually hostile work environment's existence, and to end its harassive, and improper impacts on the plaintiff?

The defendant, Goodyear Tire & Rubber Company (Goodyear), has set forth its own list of controverted issues in the order on final pretrial conference, including:

5. Whether the scope of Leiting's complaint of a hostile work environment is limited to acts of alleged sexual harassment by Brown.

Goodyear, in effect, has objected to Leiting's attempt to expand upon her hostile work environment claim.[2] That objection is well-taken, at least for purposes of ruling on Goodyear's motion for summary judgment.[3] In her complaint, Leiting specifically limited the hostile work environment claim to alleged harassment "because of her gender by a male co-worker who was Black" (i.e., Brown). Leiting therefore cannot avoid summary judgment simply by presenting evidence that Goodyear generally "permitt[ed] pornography to be displayed and used."

As to the second claim, Leiting now asserts that she was disciplined by Goodyear not only because of reverse race discrimination, but also because of sex discrimination. She thus lists the following

---

2. Goodyear has also filed a motion in limine (filing 93) which requests, among other things, that Leiting not be allowed to present evidence of improper conduct by employees other than Brown. The court makes no ruling on that motion.

3. Leiting has not filed a motion for leave to amend. Consequently, the court makes no determination of whether an amendment to include the expanded "hostile work environment" issues that were listed by Leiting at the final pretrial conference would be appropriate. See Fed.R.Civ.P. 15.

two controverted issues in the order on final pretrial conference:

a. Did Goodyear discipline Ms. Leiting by suspending or otherwise imposing discipline against her?

b. Was the Plaintiff's race or gender a motivating factor in Goodyear's decision to impose discipline against her?

Although Goodyear would be justified in objecting to the addition of the sex discrimination claim, it has not done so. Goodyear, in fact, has listed such a claim in its own statement of controverted issues, as follows:

4. Whether Goodyear illegally discriminated against Leiting based upon her gender in violation of 42 U.S.C. § 2000e, 42 U.S.C. § 1981, and/or Neb. Rev.Stat. § 48–1104.

The pretrial order supersedes all previous pleadings and controls the subsequent course of the action. *See Anderson v. Genuine Parts Co.,* 128 F.3d 1267, 1271 (8th Cir.1997); Fed.R.Civ.P. 16(e). The court therefore will consider sex discrimination to be an alleged cause of the disciplinary action.

■■■■ As Goodyear correctly observes, a claim of sex discrimination in employment is not cognizable under 42 U.S.C. § 1981. *See DeGraffenreid v. General Motors Assembly Div., St. Louis,* 558 F.2d 480, 486 n. 2 (8th Cir.1977). The elements of claims alleging disparate treatment on the basis of race under Title VII and intentional employment discrimination on the basis of race under § 1981 are identical, however. *See Kim v. Nash Finch Co.,* 123 F.3d 1046, 1063 (8th Cir.1997). Also, because the Nebraska Fair Employment Practice Act is patterned after Title VII,

Nebraska courts look to federal decisions when construing FEPA.[4] *See Father Flanagan's Boys' Home v. Agnew,* 256 Neb. 394, 590 N.W.2d 688, 693 (1999); *City of Fort Calhoun v. Collins,* 243 Neb. 528, 500 N.W.2d 822, 825 (1993);*.Airport Inn v. Nebraska Equal Opportunity Comm.,* 217 Neb. 852, 353 N.W.2d 727, 730 (1984); *Malone v. Eaton Corp.,* 187 F.3d 960, 962 n. 3 (8th Cir.1999). Consequently, in the discussion which follows, the court will not differentiate among Leiting's three "causes of action," but will simply analyze her "hostile work environment" and "disparate treatment" claims.

## II. DISCUSSION

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Egan v. Wells Fargo Alarm Servs.,* 23 F.3d 1444, 1446 (8th Cir.), *cert. denied,* 513 U.S. 929, 115 S.Ct. 319, 130 L.Ed.2d 280 (1994). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.,* 127 F.3d 649, 652 (8th Cir.1997), *cert. denied,* 523 U.S. 1004, 118 S.Ct. 1186, 140 L.Ed.2d 316 (1998).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with " 'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.' " *Moody v. St. Charles County,* 23 F.3d 1410, 1412 (8th Cir.1994) (quoting *Gregory*

4. A private right of action for violation of FEPA is afforded by Neb.Rev.Stat. § 20–148. *See Goolsby v. Anderson,* 250 Neb. 306, 549 N.W.2d 153, 157–58 (1996). The Nebraska Supreme Court has recently ruled that the applicable statute of limitations for bringing suit on FEPA claims pursuant to § 20–148 is "three hundred days after the occurrence of

the alleged unlawful employment practice," as provided in Neb.Rev.Stat. § 48–1118. *See Adkins v. Burlington Northern,* 260 Neb. 156, 615 N.W.2d 469 (2000). Because the court determines that Leiting has failed to produce sufficient evidence of a FEPA violation, it is unnecessary to determine whether the state law claims are time-barred.

*v. City of Rogers,* 974 F.2d 1006, 1010 (8th Cir.1992), *cert. denied,* 507 U.S. 913, 113 S.Ct. 1265, 122 L.Ed.2d 661 (1993)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Rule 56(e) provides that, when a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. "Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

### A. Summary of the Evidence

Leiting and Brown are both long-term Goodyear employees, having worked at the Lincoln plant for 13 and 22 years, respectively. They worked in the same department without incident for two years, from May 1995 until May 1997. (Filing 54, exhibit 6, ¶ 3) Their working relationship changed after a national strike was called in April 1997, involving the Lincoln plant. Leiting, who is an active union member, joined the strike and picketed the plant regularly. Brown was one of only two employees in the 1,370–member local bargaining unit to cross the picket line. (Filing 54, exhibit 1, 25:2–27–19; exhibit 6, ¶ 6)

On the first day back from the strike, Brown was involved in an incident in a Goodyear break room with another Goodyear employee, Joe Howard, who is married to Leiting's friend and co-worker, Vicki Howard. According to Brown, Joe Howard repeatedly called Brown a "nigger," warned Brown to watch himself, and displayed a knife. The only other person present during the incident was Vicki Howard. She and her husband denied Brown's allegations and claimed that he had threatened them with a concealed weapon. Joe Howard was instructed to stay away from Brown's break area and was given a final warning notice by Goodyear. (Filing 54, exhibit 6, ¶ 7) Brown was also issued a "stay away" letter by Goodyear and was warned that future incidents could result in suspension or termination. (Filing 98, exhibit 19)

A few days after the break room incident, on May 13, 1997, Leiting reported to the night shift coordinator, Troy Misner, that Brown was staring at her and Vicki Howard while sitting at an employee desk reading a pornographic magazine. Misner states that he immediately investigated, but could not substantiate Leiting's report. When Misner arrived Brown was sitting at the desk reading the National Enquirer or a similar, non-pornographic periodical. Misner told Brown to put the reading material away, and reminded him that it was not permitted in the plant. Although Brown denied staring at Leiting and Howard, Misner warned him that he could be

subject to discipline for such behavior. According to Misner, there were also other occasions in May 1997 when Leiting and Howard reported to him that Brown was staring at them. On none of these occasions did they report that Brown was reading pornographic material. Misner questioned Brown on each occasion, and Brown continued to deny that he was staring at Leiting or Howard. Misner also questioned other employees in the area, none of whom could confirm Leiting's and Howard's reports. In response to the reports, and at the direction of his supervisor, Margaret Studebaker, Misner for several weeks spent a majority of his time in the department where Brown, Leiting, and Howard worked. During this time he never witnessed the alleged staring behavior. After early June 1997, he also received no further complaints from Leiting or Howard. (Filing 54, exhibit 8)

Leiting's notes indicate that on May 13, 1997, Brown was sitting at the desk most of the night reading "dirty" magazines and staring at her and Vicki Howard. Troy Misner was called, but before he arrived Brown left. Brown was sitting at the desk again on May 14, 997, reading "dirty" magazines and staring at Leiting and Howard. He was also staring on May 15, 1997. On May 16, 1997, he was sitting at the desk for over four hours reading "dirty" magazines. Troy Misner came along, took a magazine from Brown, looked at it, and then handed it back. They both laughed, and Brown then put the magazine in the desk. Leiting could not see what the magazine was. After Brown left, Leiting went to the desk and removed all the magazines, which included Playboy and Hustler. These she later gave to Rose Williams, Goodyear's human resources specialist. Leiting's notes also indicate that there was an incident with Brown on May 17, 1997, after Leiting had been unable to locate him to take a personal phone call. Brown allegedly warned Leiting that the next time she hung up on one of his calls "something's going to happen to [her]." (Filing 54, exhibit 1, 127:14–129:5 and deposition exhibit 7)

Leiting and Vicki Howard met with Rose Williams on May 19, 1997, and gave her the magazines. Rose Williams immediately contacted Margaret Studebaker, the operations manager with supervisory authority over the department where Leiting, Howard, and Brown worked. (Filing 54, exhibit 3, 9:8–12:7; exhibit 6, ¶ 9)

Studebaker personally searched the department, but found no pornography. She nonetheless sent an e-mail message to all supervisory personnel to reaffirm that pornography in the department would not be tolerated. Studebaker then met with Leiting and Vicki Howard on May 21, 1997, to discuss the situation. Both stated that the magazines had been in the desk for a long time, and were read by various people sitting at the desk. Leiting stated that she had been aware of the magazines for about a year and a half,[5] but that the staring by Brown did not begin until after the strike. Studebaker asked Leiting and Howard to contact her if the problems continued, but she never heard from either of them about it again. Studebaker also spoke with certain supervisors who reported to her, and they advised that they had talked to Howard, Leiting, and Brown. She instructed them to continue to monitor the situation. (Filing 54, exhibit 5; exhibit 1, 134:9–137:7)

At some point Leiting complained about Brown's staring to the area manager, Wally Hughes. Hughes also learned from some source about the alleged pornography in the department, and he searched the employee desk, finding none. He spoke to Brown and another employee, and warned them against harassing Leiting or Howard. (Filing 54, exhibit 5; filing 98, exhibit 13)

---

**5.** Leiting earlier testified that she was aware of the magazines "probably four months prior" to the strike, and that "the guys would pull them out [of the desk drawer] to read at breaks." (Filing 54, exhibit 1, 56:10–58:16)

For several weeks after the strike ended on May 9, 1997, scores of Goodyear employees would line up in the aisle whenever Brown came to work or left to go home, in order to taunt him for having worked during the strike. (Filing 54, exhibit 6, ¶ 8) Leiting joined this so-called "gauntlet" on one occasion, on June 1, 1997. Leiting testified that she said to the person next to her, "We should say goodnight, scab," and that Brown came up to Leiting, pointed his finger at her face, and said, "Watch your back, bitch." (Filing 54, exhibit 1, 29:10–32:22) In her notes concerning the incident, however, Leiting states that after she said, "Goodnight, scab," Brown came up to her, pointed his finger in her face, and said, "I will get your fucking ass." [6] (Filing 54, exhibit 1, 127:14–129:5 and deposition exhibit 7)

In these same notes, which Leiting gave to Rose Williams, Leiting states that Brown was staring at her again on June 2, 1997, and he called her "bitch" several times while driving a heister by her machine during the course of an hour. Leiting also states that she requested Steve Otradovec, a manager, to speak to Brown about the name calling. (Filing 54, exhibit 1, 127:14–129:5 and deposition exhibit 7) Rose Williams states that Leiting dropped off the notes on or about June 2, 1997, without speaking to her about them, and that Williams made the notes available to Margaret Studebaker. (Filing 54, exhibit 6, ¶ 9)

Steve Otradovec states that Leiting told him on June 3, 1997, that Brown was walking by calling her a "bitch," and that this had happened several times. Leiting was unable to provide the names of any witnesses. Otradovec immediately confronted Brown, who denied the name calling. Otradovec warned Brown that the alleged conduct was impermissible, and would subject him to discipline. Otradovec received no further complaints about Brown from Leiting, and was never told by Leiting that Brown was reading pornographic material. (Filing 54, exhibit 7)

In her deposition, Leiting testified that Brown first called her a "bitch" after the "magazine incident," and that he continued to do so until she left the department in May 1998. Leiting was on medical leave from November 1997 until March 1998, and from May 1998 until March 1999 was on a voluntary layoff. (Filing 54, exhibit 1, 49:11–54:1; exhibit 6, ¶ 14) When Leiting returned to work in March 1999, she was assigned to a different department than Brown, and she has had no further problems with him. (Filing 54, exhibit 1, 212:21–217:3; exhibit 6, ¶ 14)

Leiting testified that she switched machines in August 1997 so that Brown could not stare at her. Leiting stated that she could not be seen at all by Brown when he sat at the employee desk and she worked at the new position. (Filing 54, exhibit 1, 114:7–116:16) Inconsistently with this testimony, Leiting recalled that Brown sat at the desk and stared at her, sometimes while reading a "dirty" magazine, every day for 1 to 4 hours, until she went on medical leave in November 1997.[7] (Filing 54, exhibit 1, 54:10–55:25) Also, at another point in her deposition, Leiting testified that after she took the Playboy and Hustler magazines to Rose Williams in May 1997, "that was it" for such magazines

6. Leiting testified in her deposition that she believed Brown made this statement during another encounter in September 1997, when Leiting allegedly uttered a racial slur. (Filing 54, exhibit 1, 47:5–49:1)

7. On September 9, 1997, Steve Otradovec received a complaint from another employee that Brown and two others were causing trouble for Leiting and Howard by staring at them. Otradovec immediately questioned Brown, who complained that Leiting had intentionally positioned herself at a location in the department where she could stare and Brown and his companions. Otradovec warned Brown to stay away from Leiting and Howard, and advised him that if it was established that he had engaged in improper conduct, he would be disciplined. (Filing 54, exhibit 7, ¶ 4)

being in the employee desk. (Filing 54, exhibit 1, 137:15–138:6)

Vicki Howard testified that if Brown took a break at the employee desk, he might sit there for up to an hour and a half reading "dirty" magazines and staring. She further testified that she once saw him "grabbing his genitals" in front of Leiting. (Filing 98, exhibit 10) Leiting did not testify regarding that incident,[8] but merely complained of Brown's "repeated staring day after day, reading dirty magazines and staring, name calling," and "threats." (Filing 54, exhibit 1, 46:12–47:1)

On September 20, 1997, an incident occurred which resulted in Leiting being suspended without pay for seven days. Brown accused Leiting of calling him a "nigger scab," and this was confirmed by a witness to the incident, Darrell Jordan. (Filing 54, exhibit 6, ¶ 10) Leiting admitted calling Brown a "scab," but denied using the racial epithet.[9] The suspension was imposed on September 25, 1997, by Wally Hughes and the business center manager, Gary Marschman. (Filing 54, exhibit 1, 59:15–96:10 and deposition exhibit 1)

For approximately one week after Leiting returned to work in October 1997, a security officer was assigned to the department where she and Brown worked to watch for any problems. (Filing 54, exhibit 1, 142:25–144:9; exhibit 3, 49:11–50:18; exhibit 6, ¶ 12) On November 20, 1997, Leiting and Brown were each issued "stay away" letters because of their mutual complaints. (Filing 54, exhibit 1, 116:17–117:22; exhibit 6, ¶ 11) Leiting took medical leave the next day, and remained off work until March 2, 1998. (Filing 54, exhibit 1, 165:15–21)

On November 24, 1997, Leiting filed a complaint with the union about the hostile work environment that had been created by Brown, Darrell Jordan, and two other employees, and the union filed a grievance. (Filing 98, exhibit 14) Goodyear denied the grievance, and the matter was not pursued further by the union. (Filing 54, exhibit 1, 96:11–108:2; 153:2–165:14; exhibit 6, ¶ 10)

In late May 1998, Darrell Jordan recanted his September 1997 statement. He informed Rose Williams, and subsequently provided a sworn statement, that Brown had persuaded him to lie about what Leiting had said. Jordan stated that there was an exchange between Brown and Leiting that he was unable to hear, after which Brown told him to say that Leiting had called Brown a "nigger scab" so that "I'll really have her, that will get her out of this department." (Filing 98, exhibit 7) On August 3, 1998, Goodyear suspended Brown for 60 days without pay for having "provided false testimony, as well as having coerced a fellow associate to provide false testimony, in a previous disciplinary matter." (Filing 54, exhibit 6, ¶ 13)

**B. Disparate Treatment Claim**

It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *See Bell v. Conopco, Inc.,* 186 F.3d 1099, 1101 (8th Cir.1999). Also, because employment discrimination cases frequently turn on inferences rather than direct evidence, the court must be particularly deferential to the party opposing summary judgment. *See id.* Indeed, the Court of

---

8. An affidavit submitted by Leiting ambiguously states that "Richard Brown and other male coworkers routinely consume [men's magazines] in the presence of female coworkers, are sexually harassive, make embarrassing comments and gestures, post these materials in common areas, and engage in similar offensive behaviors." (Filing 98, exhibit 1, ¶ 4)

9. According to Leiting, the incident occurred a short time after Brown and another employee were pointing their fingers at her and laughing. Darrell Jordan then called her "Frankenstein," in apparent reference to facial scarring which Leiting sustained in an automobile accident. In response, Leiting said to Jordan, "You're not taking the scab's side, are you?" Brown then starting yelling something at her, after which Leiting went to Wally Hughes and asked him to "handle it." (Filing 54, exhibit 1, 64:4–82:25 and deposition exhibit 9)

Appeals has recently emphasized "the oft repeated phrase that summary judgment should seldom be granted in discrimination cases." *See Bassett v. City of Minneapolis,* 211 F.3d 1097, 1099 (8th Cir.2000). In this instance, however, I conclude that summary judgment is appropriate because, apart from the fact that Leiting is a white female and Brown is a black male, there is no evidence to establish that Goodyear disciplined Leiting either because of her race or her gender, and because Leiting has failed to adduce enough admissible evidence to raise genuine doubt as to the legitimacy of Goodyear's articulated reason for her suspension. *See Buettner v. Arch Coal Sales Co., Inc.,* 216 F.3d 707, 717 (8th Cir.2000).

"In order to establish a prima facie case of racial discrimination, the plaintiff must show that she 1) was a member of a protected group, 2) was meeting the legitimate expectations of her employer, 3) suffered an adverse employment action, and 4) that similarly situated employees, who are not members of the protected group, were treated differently.[10] *See Austin v. Minnesota Mining & Mfg. Co.,* 193 F.3d 992, 995 (8th Cir.1999). If this prima facie case is made out, the burden then shifts to the employer to identify a legitimate reason for the adverse employment action. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The burden then shifts back to the employee to show that the articulated reason was a pretext. *See id.* at 804, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668." *Clark v. Runyon,* 218 F.3d 915, 918 (8th Cir.2000). Leiting, of course, is not a member of a protected racial group, and so she must establish a more difficult case of reverse discrimination.

"In reverse discrimination cases, several courts have held that, to present a prima facie case, a plaintiff must show 'that background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.' *Murray v. Thistledown Racing Club, Inc.,* 770 F.2d 63, 67 (6th Cir.1985) (quotations and citations omitted); *see also Bishopp v. District of Columbia,* 788 F.2d 781, 786 (D.C.Cir.1986) ('A plaintiff's minority status by itself is sufficient in light of historical practice in the workplace toward such socially disfavored groups to give rise to an inference of discriminatory motivation. White males, who as a group historically have not been hindered in the workplace because of their race or sex, are required to offer other particularized evidence, apart from their race and sex, that suggests some reason why an employer might discriminate against them.' (quotations, citations, and alterations omitted)). However, '[j]ust because a reverse discrimination claimant cannot show the background circumstances necessary to trigger the *McDonnell Douglas* presumption does not inexorably mean that his employer has not intentionally discriminated against *him.* ... An employee who is the victim of intentional discrimination in such circumstances, and who adduces sufficient evidence of that discrimination, should be permitted to proceed beyond the prima facie case stage of litigation.' " *Duffy v. Wolle,* 123 F.3d 1026, 1036 (8th Cir.1997) (quoting *Notari v. Denver Water Dep't,* 971 F.2d 585, 590 (10th Cir.1992) (emphasis in original)), *cert. denied,* 523 U.S. 1137, 118 S.Ct. 1839, 140 L.Ed.2d 1090 (1998).

■ In order to avoid summary judgment on the racial discrimination claim, in other words, Leiting must either provide some evidence of "backgound circumstances" that Goodyear tends to discriminate against white employees, or else

---

**10.** The elements of a prima facie case of sex discrimination are identical. *See Schoffstall v. Henderson,* 223 F.3d 818, 825 (8th Cir. 2000) (a plaintiff must demonstrate "that he or she (1) is a member of a protected class; (2) was qualified to perform her job; (3) suffered an adverse employment action; and (4) was treated differently that similarly-situated persons of the opposite sex.")

provide direct evidence [11] that she was intentionally discriminated against in this case because she is white. Leiting has done neither.[12]

■ Leiting has also failed to establish that similarly situated employees—either with respect to the racial discrimination claim or the sex discrimination claim—were treated differently from her. It is not enough to complain generally about unfair treatment or to argue that Brown was never disciplined for his harassing conduct. Rather, Leiting "has the burden of demonstrating that there were individuals similarly situated in all relevant aspects to her by a preponderance of the evidence. Specifically, the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Clark*, 218 F.3d at 918 (citations omitted). *See also Griffin v. Super Valu*, 218 F.3d 869, 871–72 (8th Cir.2000). One obvious distinguishing circumstance is that Brown had a witness to the September 20, 1997 name-calling incident, whereas Goodyear's investigations into Leiting's various complaints did not yield any corroborative evidence. Brown, of course, also is not alleged to have engaged in racial slurs.[13]

■ Even assuming that Leiting could establish a prima facie case of reverse racial discrimination or of sex discrimination, she has not presented any evidence that the reason given by Goodyear for her suspension was pretextual. While it is questionable whether Leiting actually called Brown a "nigger scab," that is not the determinative issue here. Instead, the relevant inquiry is whether Goodyear believed Leiting was guilty of conduct justifying suspension. *See Scroggins v. University of Minnesota*, 221 F.3d 1042, 1045 (8th Cir.2000). No genuine issue exists concerning this fact.

Furthermore, the core question in a case such as this does not, ultimately, concern the veracity of the facts underlying an employer's legitimate non-discriminatory reason for disciplining its employee, but rather concerns whether the employment decision was based upon intentional discrimination. *See Stuart v. General Motors Corp.*, 217 F.3d 621, 637 (8th Cir.2000). Merely disputing Goodyear's reason is insufficient; Leiting must show both that the reason was false, and that discrimination on account of her race or gender was the real reason. *See id.* at 634. As already explained, there is no competent evidence that Goodyear acted because of a discriminatory motive.[14] To the contrary,

---

**11.** Direct evidence is evidence of conduct or statements by persons involved in the decisionmaking process that is sufficient for a factfinder to find that a discriminatory attitude was more likely than not a motivating factor in the employer's decision. *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1017 (8th Cir.1999).

**12.** Leiting relies upon the joint affidavit of Joe and Vicki Howard, who state: "Goodyear's management is known to be afraid of Mr. Brown who is African American. Mr. Brown has a history and reputation for 'playing the race card' by claiming he has been offended by a Caucasian worker who has allegedly addressed him with a racial slur. Ms. Leiting was accused of such activity at one time, but the accusation proved to be false when a purported witness stated that he never saw or heard this occur. Other episodes of a similar nature are known to have happened. Yet

Goodyear tends to favor Mr. Brown over Caucasians who complain—particularly if those Caucasians are female." (Filing 98, exhibit 3, ¶ 4) This statement, even if it could be considered probative of discriminatory conduct, contains only ultimate or conclusory facts, which are ineffective for purposes of Fed. R.Civ.P. 56(e).

**13.** Although it is not up to the employer to prove dissimilarity, *see Lanear v. Safeway Grocery*, 843 F.2d 298, 301 (8th Cir.1988), Goodyear has also presented evidence that two minority males were suspended during the last two years in the Lincoln plant for directing racial remarks at co-workers. (Filing 54, exhibit 6, ¶ 16)

**14.** Leiting testified to her belief that the only reason Goodyear acted upon Brown's accusation was that he is black and she is white. (Filing 54, exhibit 1, 108:3–110:22) A state-

the evidence establishes that Goodyear's action was decidedly anti-discriminatory, and was taken in the honest belief that Leiting had violated company policy by uttering a racial slur.[15] A plaintiff facing a summary judgment motion cannot "get to a jury without 'any significant probative evidence tending to support the complaint.'" *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 (quoting *First Nat'l Bank of Az. v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). Accordingly, Goodyear's motion for summary judgment will be granted with respect to Leiting's "disparate treatment" claim.

**C.  Hostile Work Environment Claim**

■ To make out a prima facie case of hostile environment harassment by a non-supervisory co-worker, Leiting must establish: (1) membership in a protected group; (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and her membership in the protected group; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action. *See Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir.1999).

■ Whether harassing conduct constitutes discrimination based on sex is determined by whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed. *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 965 (8th Cir.1999) (citing *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 358 (8th Cir.1997); *Quick v. Donaldson*

*Co.*, 90 F.3d 1372, 1378 (8th Cir.1996)). Stated differently, the harassment must be based on the complaining person's sex. *Id.* A plaintiff must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "discrimina[tion] ... because of ... sex." *See Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

■ There is no bright line between sexual harassment and merely unpleasant conduct, and not every aspect of a work environment characterized by hostility and intimidation need be explicitly sexual in nature to be probative. *See Hathaway v. Runyon*, 132 F.3d 1214, 1221–22 (8th Cir.1997). A work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it "into a series of discrete incidents.". *Id.*, at 1222 (quoting *Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 559, 564 (8th Cir.1992)).

■ A court evaluating a Title VII claim must evaluate the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Klein v. McGowan*, 198 F.3d 705, 709 (8th Cir.1999) (citing *Phillips v. Taco Bell, Corp.*, 156 F.3d 884, 888 (8th Cir.1998)). The conduct complained of must have been severe or pervasive enough to create an objectively hostile or abusive work environment. *Id.* (citing *Harris v. Forklift*

ment of belief does not meet the standards of Fed.R.Civ.P. 56(e), and is ineffective to create a genuine issue of material fact that would preclude summary judgment. *See Marler v. Missouri Bd. of Optometry*, 102 F.3d 1453, 1457 (8th Cir.1996). Leiting's statement does, however, serve to demonstrate the lack of any substance to her sex discrimination claim.

**15.** To the extent Leiting claims that Goodyear should have compensated her after Darrell

Jordan recanted his statement, she has also failed to show that in this respect she was treated differently from similarly situated employees. Goodyear further contends that Leiting's innocence was not proven by Jordan's recantation, and also points to the fact that Leiting failed two polygraph examinations regarding whether she had called Brown a "nigger scab." (Filing 54, exhibit 1, 153:2–165:14 and deposition exhibits 11, 12)

*Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Isolated incidents generally cannot amount to severe or pervasive harassment. *Id.* (citing *Breeding v. Arthur J. Gallagher & Co.,* 164 F.3d 1151, 1158 (8th Cir.1999)).

██ The evidence in this case is insufficient to establish that Leiting was harassed by Brown because of her gender. Their mutual animosity stemmed from the strike at the Goodyear plant in April 1997. Leiting's primary complaint, that Brown stared at her, has not been shown to have a sexual connotation. Although Leiting attempts to link Brown's staring to his reading of "dirty" magazines, she has admitted that she was aware that such magazines were being read at the desk by male employees for a year and a half before she first complained about Brown, on May 13, 1997. Given this fact, it is rather difficult to accept her contention that such reading activity was unwelcome. Furthermore, Leiting testified that after she removed the Playboy and Hustler magazines from the desk on May 16, 1997, "that was it" for such magazines, but that the staring continued. Any linkage between Brown's staring at Leiting and his viewing of "dirty" magazines was therefore very brief.

██ Leiting's other complaint, that Brown repeatedly called her a "bitch," has likewise not been shown to involve sexual harassment. Gender-based insults may create a presumption that discrimination was based on sex, *see Carter,* 173 F.3d at 700, but the "mere use of the word 'bitch,' without other evidence of sex discrimination, is not particularly probative of a general misogynist attitude." *Hocevar v. Purdue Frederick Co.,* 223 F.3d 721, 737 (8th Cir.2000) (citing *Kriss v. Sprint Communications Co.,* 58 F.3d 1276, 1281 (8th Cir.1995)).

██ In any event, the evidence establishes that Goodyear responded promptly and adequately to Leiting's complaints. An employer is not liable if it takes prompt remedial action which is reasonably calculated to end the harassment once the employer knew or should have known about the harassment. *Scusa,* 181 F.3d at 967. Goodyear's managers immediately investigated every complaint that Leiting made and issued verbal warnings to Brown, even though they were unable to substantiate her complaints. Searches were made for pornographic materials. Supervision of the department was increased, but no "staring" incidents were observed. After Leiting's suspension a security guard was posted in the department, and Brown and Leiting were each issued "stay away" letters. Although Leiting contends that the harassment was continuing, she never went back to any of her supervisors to advise that further corrective action was required. Under these circumstances, the "hostile work environment" claim fails as a matter of law.

### III. CONCLUSION

For the reasons stated, Goodyear's motion for summary judgment will be granted and Leiting's complaint will be dismissed with prejudice. Accordingly,

IT IS ORDERED:

(1) Defendant's motion for leave to file a supplemental brief (filing 89) is granted instanter;

(2) Defendant's motion for leave to file original declaration (filing 90) is granted instanter;

(3) Defendant's motion for summary judgment (filing 51) is granted; and

(4) Plaintiff's complaint is dismissed with prejudice.

### JUDGMENT

Pursuant to the court's **Memorandum and Order** previously filed this date, final judgment is entered in favor of Defendant

and against Plaintiff, and Plaintiff's complaint is dismissed with prejudice.