**Catharina F. COSTA, Plaintiff–Appellee,**

v.

**DESERT PALACE, INC., dba Caesars Palace Hotel & Casino, Defendant–Appellant.**

No. 99–15645.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 21, 2002.

Filed Aug. 2, 2002.

Mark J. Ricciardi, David B. Dornak, Michael J. Shannon, Ricciardi Law Group, Las Vegas, NV, for defendant-appellant.

Robert N. Peccole, Peccole & Peccole, Ltd., Las Vegas, NV, for plaintiff-appellant.

Before SCHROEDER, Chief Judge, REINHARDT, KOZINSKI, FERNANDEZ, KLEINFELD, SILVERMAN, GRABER, McKEOWN, FISHER, GOULD, and PAEZ, Circuit Judges.

## OPINION

McKEOWN, Circuit Judge

We agreed to hear this case en banc [1] primarily to examine the legal standard for proof of a violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991. In this classic instance of what has been termed a "mixed-motive" case, the employer, Caesars Palace Hotel and Casino ("Caesars"), terminated Catharina Costa, the only woman in her bargaining unit, citing disciplinary problems. Costa argued, and the jury agreed, that sex was "a motivating factor" in her termination. 42 U.S.C. § 2000e–2(m). Because Caesars failed to establish that she would have been terminated without consideration of her sex, the jury awarded back pay and compensatory damages. Finally, the jury found that the discrimination was "egregious" and warranted punitive damages. Caesars argues that Costa should have been held to a special, higher standard of "direct evidence," a threshold it claims she did not meet. We disagree. Title VII imposes no special or heightened evidentiary burden on a plaintiff in a so-called "mixed-motive" case. Consequently, we affirm the liability finding as well as the judgment for back pay and compensatory damages. In light of intervening Supreme Court authority, we remand with respect to punitive damages. *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999).

## BACKGROUND

Catharina Costa is a trailblazer. She has worked most of her life in a male-dominated environment, driving trucks and operating heavy equipment. At Caesars, a well known casino in Las Vegas, she worked in a warehouse and, along with members of her bargaining unit, Teamsters Local 995, operated the forklifts and pallet jacks to retrieve food and beverage orders. Costa was the only woman in this job.

Costa's work was characterized as "excellent" and "good." As her supervisor explained: "We knew when she was out there the job would get done." Nonetheless, she experienced a number of problems with management and her co-workers. At first, she responded by simply focusing on doing her job well. Slowly, Costa began to notice that she was being singled out because she was a woman. Her concerns not only fell on deaf ears— "my word meant nothing"—but resulted in her being treated as an "outcast."

In a series of escalating events that included informal rebukes, denial of privi-

---

1. *Costa v. Desert Palace, Inc.,* 268 F.3d 882 (9th Cir.2001), *reh'g en banc granted,* 274 F.3d 1306 (9th Cir.2001).

leges accorded her male co-workers, suspension, and finally discharge, Costa's efforts to resolve problems were thwarted along the way. The situation deteriorated so significantly that she finally complained to the human resources department, which declined to intervene.

There were "so many" incidents, it was difficult for her to recount them all. Nonetheless, her testimony at trial on this point was detailed and extensive. For example, when men came in late, they were often given overtime to make up the lost time; when Costa came in late—in one case, one minute late—she was issued a written reprimand, known as a record of counseling. When men missed work for medical reasons, they were given overtime to make up the lost time; when Costa missed work for medical reasons, she was disciplined. On one occasion, a warehouse supervisor actually suspended her because she had missed work while undergoing surgery to remove a tumor; only the intervention of the director of human resources voided this action.

In another episode, corroborated at trial by a fellow employee who was an eyewitness, a number of workers were in the office eating soup on a cold day. A supervisor walked in, looked directly at Costa, and said, "Don't you have work to do?" He did not reprimand any of her colleagues—all men. Another supervisor began to follow her around the warehouse. Although several other Teamsters complained about this supervisor's scrutiny, three witnesses, in addition to Costa, testified that she was singled out for particularly intense "stalking."

Costa presented extensive evidence that she received harsher discipline than the men. For instance, she was frequently warned and even suspended for allegedly hazardous use of equipment and for use of profanity, yet other Teamsters engaged in this conduct with impunity. In at least one instance, such a charge against Costa was found to have been fabricated and the suspension voided. Supervisors began to "stack" her disciplinary record. In one case, a supervisor issued multiple warnings on a single day, including docking her for an absence that dated back over eight months and for absences that occurred when Costa was under a doctor's care. Another warehouse manager steered a co-worker who had a dispute with Costa to security instead of handling the matter himself because the manager wanted to bring "this problem with Costa to a 'head.' "

Costa was also treated differently than her male colleagues in the assignment of overtime. For example, in an analysis of 95.5 hours of overtime assigned to eight Teamsters, Costa received only two hours. Failure to assign overtime was not for Costa's lack of willingness to work additional hours. Costa was listed as "refusing" overtime when she was on vacation. When she was offered overtime, it was at the last minute, making it impractical for her to accept. The situation became more blatant when Costa asked her supervisors point blank about the differential treatment of another Teamster who was favored with overtime assignments. The response: He "has a family to support."

Costa also presented evidence that she was penalized for her failure to conform to sexual stereotypes. Although her fellow Teamsters frequently lost their tempers, swore at fellow employees, and sometimes had physical altercations, it was Costa, identified in one report as "the lady Teamster," who was called a "bitch," and told "[y]ou got more balls than the guys." Even at trial, and despite testimony that she "got along with most people" and had "few arguments," Caesars' managers continued to characterize her as "strong

willed," "opinionated," and "confrontational," leading counsel to call her "bossy" in closing argument. Supervisor Karen Hallett, who later signed Costa's termination order, expressly declared her intent to "get rid of that bitch," referring to Costa.

Supervisors frequently used or tolerated verbal slurs that were sex-based or tinged with sexual overtones. Most memorably, one co-worker called her a "fucking cunt." When she wrote a letter to management expressing her concern with this epithet, which stood out from the ordinary rough-and-tumble banter, she received a three-day suspension in response. Although the other employee admitted using the epithet, Costa was faulted for "engaging in verbal confrontation with co-worker in the warehouse resulting in use of profane and vulgar language by other employee."

These events culminated in Caesars' termination of Costa. The purported basis for termination was a physical altercation in the warehouse elevator with another Teamster, Herb Gerber. This incident began, as Gerber admitted, when he went looking for Costa, upset about a report that he believed she had made about his unauthorized lunch breaks. Gerber trapped Costa in an elevator and shoved her against the wall, bruising her arm. Costa gave a detailed account of the altercation. Right away she told supervisor Hallett. Reassured that Hallett would investigate, Costa returned to work, only to have Gerber seek her out and "come at" her a second time. Costa's account was also corroborated by her immediate reports to union officials, by photographs of the bruises, and by a witness who had seen Gerber blocking the elevator door. In contrast, Gerber did not immediately report the incident, had no physical corroboration, and provided few details. He first denied that the altercation was physical,

but then changed his story to state that Costa had, in fact, hit him.

Nonetheless, Caesars did not believe Costa. Caesars reasoned that the facts were in dispute, so it disciplined both employees—Gerber with a five-day suspension and Costa with termination.

Both Costa and Gerber grieved their respective disciplines pursuant to the collective bargaining agreement, which did not cover sex discrimination. The arbitrator upheld both actions. After receiving an EEOC right to sue letter, Costa filed this suit. The trial court dismissed her claim of sexual harassment on summary judgment, but allowed the other disparate treatment claim to proceed.

At trial, Caesars maintained that Costa was terminated because of her disciplinary history and her altercation with Gerber. Costa did not suggest that she was a model employee, but rather that her sex was a motivating factor in her termination. After hearing Costa's testimony, Judge Hagen, the trial judge, admonished counsel: "This is a case that should have settled." He denied Caesars' motion for judgment as a matter of law at the close of Costa's case, which was renewed at the close of the evidence. The jury returned a verdict in favor of Costa for $64,377.74 back pay, $200,000 compensatory damages, and $100,000 punitive damages. When Judge Hagen denied defense motions for judgment as a matter of law notwithstanding the verdict, and for a new trial, he elaborated as follows: "At trial, the evidence showed a pattern of disparate treatment favoring male co-workers over plaintiff in the application of disciplinary standards, allowance of overtime, and in her termination. From this evidence reasonable minds could infer that plaintiff's gender played a motivating part in Caesars's conduct towards plaintiff . . . ." He did, how-

ever, grant remittitur, and Costa agreed to reduce compensatory damages to $100,000.

### DISCUSSION

Title VII itself provides the benchmark for resolving the primary question in this case. Although the road from Title VII to resolution of Costa's case rests ultimately on a straightforward examination of the statute, it is helpful to examine the statute's structure and the history of the 1991 amendments to the statute. After analyzing the import of the passing reference to "direct evidence" in Justice O'Connor's concurring opinion in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 270, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), and the framework for Title VII cases, we address the evidence in Costa's case, including the claim that evidence of an arbitration award was erroneously excluded, and the propriety of giving a "mixed-motive" jury instruction. We conclude by examining the punitive damages award in light of *Kolstad*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494.

## I. TITLE VII STATUTORY FRAMEWORK AND DEVELOPMENT

Title VII prohibits discrimination "because of" a protected characteristic, such as race or sex. Such discrimination is deemed "an unlawful employment practice":

(a) Employer practices

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]

42 U.S.C. § 2000e–2(a).

The 1991 Act added § 2000e–2(m), which provides that "an unlawful employment practice is established" when a protected characteristic is "a motivating factor" in an employment action:

> Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

Civil Rights Act of 1965, Title VII, § 701, 42 U.S.C. § 2000e–2(m) (as amended by Civil Rights Act of 1991, Pub.L. No. 102–166, § 107(a), 105 Stat. 1071 (1991)).

The 1991 Act also provided an affirmative defense that limits the remedies if an employer demonstrates that it would have nonetheless made the "same decision":

> On a claim in which an individual proves a violation under section 2000e–2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court—
>
> (i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e–2(m) of this title; and
>
> (ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).

42 U.S.C. § 2000e–5(g)(2)(B).

■ We think this text is crystal clear: an employee makes out a Title VII violation by showing discrimination "because of" race, sex, or another protected factor. Such discrimination is characterized by the statute as "an unlawful employment practice."

■ More specifically, "an unlawful employment practice" encompasses any situation in which a protected characteristic was "a motivating factor" in an employment action, even if there were other motives. In such a case—sometimes labeled with the "mixed-motive" moniker—if the employee succeeds in proving only that a protected characteristic was one of several factors motivating the employment action, an employer cannot avoid liability altogether, but instead may assert an affirmative defense to bar certain types of relief by showing the absence of "but for" causation.

■ [4] The amendments to the statute have done nothing to change the plaintiff's long-standing burden: "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *accord Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Nor can we discover anything in this statute that warrants imposing a special evidentiary rule on or hurdle for victims of discrimination to prove their case.

> The burden of showing something by a "preponderance of the evidence," the most common standard in the civil law, "simply requires the trier of fact 'to believe that the existence of a fact is more probable than its nonexistence before [it] may find in favor of the party who has the burden to persuade the [jury] of the fact's existence.'"

*Concrete Pipe & Prods. of Cal. v. Constr. Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 622, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (quoting *In re Winship,* 397 U.S. 358, 371–72, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring) (citation omitted)). The inquiry is simply that of any civil case: whether the plaintiff's evidence is sufficient for a rational factfinder to conclude by a preponderance of the evidence that the employer violated the statute—that "race, color, religion, sex, or national origin was a motivating factor for any employment practice."

## A. PRICE WATERHOUSE

Although Title VII imposes no special burden of proof on discrimination plaintiffs, some courts have fashioned a heightened burden based not on the statute but on the case that prompted its amendment, *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). We turn to that case. There, the Supreme Court confronted a problem not previously encountered in the statute's twenty-five year history: causation. The issue presented was whether there should be liability where an adverse employment decision was the result of mixed motives. More specifically, the trial court found that the failure to select Ann Hopkins for partner at an accounting firm was motivated both by legitimate concerns about her interpersonal skills and by "an impermissibly cabined view of the proper behavior of women." *Id.* at 236–37, 109 S.Ct. 1775.

All nine justices essentially agreed that liability was inappropriate where the employer would have made the same decision absent sex discrimination—in other words, the illegitimate factor was not a "but for" cause—but they divided over the nuances of the burden of proof. Four justices agreed that "when a plaintiff in a Title VII case proves that her gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account." *Id.* at 258, 109 S.Ct. 1775 (plurality opinion). These jus-

tices made clear that when "an employer considers both gender and legitimate factors at the time of making a decision, that decision was 'because of' sex." *Id.* at 241, 109 S.Ct. 1775. But, the employer could escape liability through the "same decision" affirmative defense. The dissent criticized the plurality for "its shift to the defendant of the burden of proof," *id.* at 281, 109 S.Ct. 1775 (Kennedy, J., dissenting), and argued that the plaintiff should have to prove, by a preponderance of the evidence, that discrimination was the "but for" cause of the challenged action. In response, the plurality emphasized that it offered the defendant an affirmative defense to liability only *after* the plaintiff established that discriminatory animus played a role in the challenged employment action:

> [S]ince we hold that the plaintiff retains the burden of persuasion on the issue whether gender played a part in the employment decision, the situation before us is not … one of "shifting burdens" …. Instead, the employer's burden is most appropriately deemed an affirmative defense: the plaintiff must persuade the factfinder on one point, and then the employer, if it wishes to prevail, must persuade it on another.

*Id.* at 246, 109 S.Ct. 1775. Regardless of nomenclature, the plurality agreed that if the employer showed a lack of "but for" causation, then that showing precluded liability.

Justice O'Connor and Justice White each wrote separately, concurring in the judgment only. Justice White relied on *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), a First Amendment case holding that a showing that constitutionally protected conduct had been a "motivating factor" in an employment decision was sufficient to shift the burden to the state to prove the absence of causation. *Price Waterhouse*, 490 U.S. at 258–59, 109 S.Ct. 1775 (White, J., concurring in the judgment). He found it unnecessary to parse the semantic distinction whether "the *Mt. Healthy* approach is 'but-for' causation in another guise or creates an affirmative defense." *Id.* at 259, 109 S.Ct. 1775. Justice O'Connor traced the burdenshifting approach back to venerable tort cases such as *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1, 3–4 (Cal.1948). *Price Waterhouse*, 490 U.S. at 263–64, 109 S.Ct. 1775 (O'Connor, J., concurring in the judgment).

Justice O'Connor had further gatekeeping concerns about when what she considered to be a special "burden shift" might be invoked, thus permitting the plaintiff to make less than the full showing necessary for a statutory violation:

> I believe there are significant differences between shifting the burden of persuasion to the employer in a case resting purely on statistical proof as in the disparate impact setting and shifting the burden of persuasion in a case like this one, where an employee has demonstrated by direct evidence that an illegitimate factor played a substantial role in a particular employment decision.

*Id.* at 275, 109 S.Ct. 1775. It was in this context that she discussed a need for "direct evidence" to show that the employer's "decisional process has been substantially infected by discrimination" before the special burden shift would be triggered. *Id.* at 269–70, 109 S.Ct. 1775. Because it was arguably the "narrowest ground" for the decision, Justice O'Connor's one-justice concurring opinion was considered by some to be the controlling analysis. *Fernandes v. Costa Bros. Masonry*, 199 F.3d 572, 580 (1st Cir.1999); *but see Thomas v. Nat'l Football League Players Ass'n*, 131 F.3d 198, 203 (D.C.Cir.1997) ("Justice

O'Connor's concurrence was one of six votes supporting the Court's judgment ..., so that it is far from clear that [it ] should be taken as establishing binding precedent."), *as vacated in part on reh'g*, 1998 WL 1988451 (D.C.Cir. Feb.25, 1998); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1183 (2d Cir.1992) (" '[D]irect evidence' was *not* a requirement imposed by the majority in *Price Waterhouse*.").

## B. 1991 CIVIL RIGHTS ACT AMENDMENTS TO TITLE VII

Congress quickly responded to *Price Waterhouse* and a handful of other Supreme Court employment discrimination decisions with the introduction of the Civil Rights Act of 1990, which targeted "the Supreme Court's recent decisions by restoring the civil rights protections that were dramatically limited by those decisions." H.R. Conf. Rep. No. 101–856, at 1 (1990). Although the 1990 legislation ultimately floundered, an amended version, with much of the text intact, became the Civil Rights Act of 1991, which expressly overruled the basic premise that an employer could avoid all liability under Title VII by establishing the absence of "but for" causation.

Now, under Title VII, the use of a prohibited characteristic (race, color, religion, sex, or national origin) as simply "a motivating factor" in an employment action is unlawful. 42 U.S.C. § 2000e–2(a)(1). Congress did, however, add one safety valve: an employer can escape damages and orders of reinstatement, hiring, promotion and the like—but not attorney's fees or declaratory or injunctive relief-by proving the absence of "but for" causation as an affirmative defense. *Id.* § 2000e–2(m). To the extent that there was confu-

sion after *Price Waterhouse*—semantic or otherwise—with respect to burden shifting, the amendment clarified (1) that a Title VII violation is established through proof that a protected characteristic was "a motivating factor" in the employment action and (2) that the employer's "same decision" evidence serves as an affirmative defense with respect to the scope of remedies, not as a defense to liability.

The legislative history evinces a clear intent to overrule *Price Waterhouse*. In a subsection titled "The Need to Overturn *Price Waterhouse*," the report accompanying the 1991 Civil Rights Act reflects congressional concern that the "inevitable effect of the *Price Waterhouse* decision [was] to permit prohibited employment discrimination to escape sanction under Title VII." H.R.Rep. No. 102–40(I), at 46 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 584. The report elaborates:

> When Congress enacted the Civil Rights Act of 1964, it precluded all invidious consideration of a person's race, color, religion, sex or national origin in employment. The effectiveness of Title VII's ban on discrimination on the basis of race, color, religion, sex or national origin has been severely undercut by the recent Supreme Court decision in *Price Waterhouse v. Hopkins.*

*Id.* at 45. We do not disagree with those courts that have noted that the legislative history does not address Justice O'Connor's "direct evidence" comment. *See, e.g., Watson v. Southeastern Pa. Transp. Auth.*, 207 F.3d 207, 218–19 (3d Cir.2000), *cert. denied,* 531 U.S. 1147, 121 S.Ct. 1086, 148 L.Ed.2d 961 (2001).[2] What the history does show beyond doubt, however, is that the premise for Justice O'Connor's comment is wholly abrogated: No longer may

---

2. For a thorough analysis concluding that the legislative history is unhelpful on the "direct evidence" requirement, see Benjamin C. Miz-

er, Note, *Toward a Motivating Factor Test for Individual Disparate Treatment Claims,* 100 Mich. L.Rev. 234, 256–60 (2001).

"employers' discriminatory conduct escape[ ] liability," H.R. Rep. 40(I) at 47, simply by showing other sufficient causes. Consequently, there is no longer a basis for any special "evidentiary scheme" or heightened standard of proof to determine "but for" causation.

## C. "DIRECT EVIDENCE"

Following *Price Waterhouse* and the Civil Rights Act of 1991, much has been made of Justice O'Connor's passing reference to "direct evidence." Indeed, the reference has spawned a virtual cottage industry of litigation over the effect and meaning of the phrase. It is unnecessary, however, to get mired in the debate over whether Justice O'Connor's opinion was controlling or not because the resolution to this conundrum lies in the 1991 amendments.

Justice O'Connor's reference must be interpreted in light of the Court's understanding at the time of *Price Waterhouse,* namely, that "but for" causation was factored into proof of a Title VII violation, either as an affirmative defense (plurality) or as part of the plaintiff's proof (dissent). Justice O'Connor wrote separately in part to "express [her] views as to when and how the strong medicine of requiring the employer to bear the burden of persuasion on the issue of causation should be administered." *Price Waterhouse,* 490 U.S. at 262, 109 S.Ct. 1775. Her reference to "direct evidence" was intertwined with her concern about a scheme that shifted the burden on the question of liability from the employee to employer, albeit through an affirmative defense. The 1991 Act eliminated any confusion about burden-shifting and the proof necessary for a Title VII violation, so it is not surprising that courts have had trouble converting Justice O'Connor's reference into a legal standard under the new statutory provision.

The resulting jurisprudence has been a quagmire that defies characterization despite the valiant efforts of various courts and commentators. Within circuits, and often within opinions, different approaches are conflated, mixing burden of persuasion with evidentiary standards, confusing burden of ultimate persuasion with the burden to establish an affirmative defense, and declining to acknowledge the role of circumstantial evidence. We see no need to get bogged down in this debate. Rather, based on the language of the statute—which requires proof of only "a motivating factor" and does not set out any special proof burdens—we conclude that Congress did not impose a special or heightened evidentiary burden on the plaintiff in a Title VII case in which discriminatory animus may have constituted one of two or more reasons for the employer's challenged actions. 42 U.S.C. § 2000e–2(m).

This approach is consistent with recent Supreme Court cases underscoring that no special pleading or proof hurdles may be imposed on Title VII plaintiffs. For example, in *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 997–99, 152 L.Ed.2d 1 (2002), the Court struck down judicially imposed heightened pleading standards. Just two years earlier, in *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097, it declined to require independent evidence of discrimination in addition to prima facie evidence and sufficient evidence to rebut pretext. Instead, the Court emphasized that the jury determines the ultimate question of liability. *Id.* Sticking to the statutory wording, in *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80–81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), the Court rejected various circuits' special requirements for same-sex sexual harassment cases. Finally, in *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 752–53, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), the Court quashed distinctions between "quid

pro quo" and "hostile environment" liability structures in harassment cases. Here, too, we believe that we are well advised to follow the statute instead of engaging in judicial invention.

To understand why we should stick to the statute rather than divine a new standard of proof, it is instructive to look at the state of circuit law in this area. Judge Selya has made an attempt to categorize the circuits' approaches in a framework that provides a useful overview. *Fernandes*, 199 F.3d at 582. He first discusses the "classic" position, an approach that takes the definition of "direct evidence" from the dictionary: " 'evidence, which if believed, proves existence of fact in issue *without inference or presumption.*' " *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 n. 6 (11th Cir.1987) (quoting *Black's Law Dictionary* 413 (5th ed.1979)) (emphasis in *Rollins* ). Judge Selya notes that "only the Fifth and Tenth Circuits cling consistently to this view, [but] other tribunals have embraced it periodically." *Fernandes*, 199 F.3d at 582.

Next is the "animus plus" position, which basically requires that the plaintiff prove a particularly strong case—more than ordinarily would be required for an inference of discrimination to be permissible. Our review indicates that a majority of courts that impose a "direct evidence" requirement adhere to this view, either explicitly or implicitly. *See, e.g., Thomas*, 131 F.3d at 204 (defining direct evidence as "a relationship between proof and incidents"); *Fernandes*, 199 F.3d at 580 (explaining the function of direct evidence as restricting the mixed-motive analysis "to those infrequent cases in which a plaintiff can demonstrate [discrimination] with a high degree of assurance"); *Fuller v.*

*Phipps*, 67 F.3d 1137, 1143 (4th Cir.1995) (holding that the determination "hinges on the strength of the evidence"); *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1105 (11th Cir.2001) (requiring, under the rhetoric of banning circumstantial evidence, "only the most blatant remarks") (citation omitted). Judge Selya places the Fourth, D.C., Ninth,[3] and Third circuits in this camp, not without hesitation, and indicates that other circuits indicate "occasional approval" of this approach. *Fernandes*, 199 F.3d at 582.

Finally, there is the "animus" position, which simply requires evidence that bears on the alleged discriminatory animus or, put even more simply, evidence of discrimination. Judge Selya places the Second Circuit, the Eighth Circuit "intermittently," and other stray cases, in this camp. *Id.*

Other courts and commentators have had even more difficulty articulating an order to the chaos. *See, e.g., Thomas*, 131 F.3d at 205 (citing Fifth, Tenth, and Eleventh Circuits as taking "direct evidence" to mean non-inferential); Christopher Y. Chen, Note, *Rethinking the Direct Evidence Requirement: A Suggested Approach in Analyzing Mixed Motives Discrimination Claims*, 86 Cornell L.Rev. 899, 908–15 (2001); Robert Belton, *Mixed Motive Cases in Employment Discrimination Law Revisited: A Brief Updated View of the Swamp*, 51 Mercer L.Rev. 651, 663 (2000) ("The line between *McDonnell Douglas* and *Price Waterhouse* is very murky.").

Indeed, within circuits, cases sometimes take different approaches. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1294 (11th Cir.1999) (recognizing intra-circuit

---

**3.** We view this categorization of Ninth Circuit law as misplaced. The case cited in *Fernandes, Lambert v. Ackerley*, 180 F.3d 997, 1008–09 (9th Cir.1999) (en banc), does not adopt the "animus plus" approach.

splits). For example, the First Circuit first embraced the animus plus approach in *Fernandes*, 199 F.3d at 580, but recently implied in *Weston–Smith v. Cooley Dickinson Hospital*, 282 F.3d 60, 64 (1st Cir.2002), that it took the classic approach. The Eleventh Circuit first allowed "broad statements" of discriminatory attitude, *Burrell v. Bd. of Trustees of Ga. Military Coll.*, 125 F.3d 1390, 1394 n. 7 (11th Cir. 1997), but later concluded that only statements related to the decisionmaking process were sufficient to overcome the special "direct evidence" hurdle, *Bass*, 256 F.3d at 1105.

In a carefully considered decision issued shortly after the Civil Rights Act of 1991, the Second Circuit held that direct evidence simply meant evidence sufficient to permit the trier of fact to conclude that an illegitimate characteristic was a motivating factor in the challenged decision under Title VII. *Tyler*, 958 F.2d at 1185. However, a few months later, a different panel held that discrimination victims face the special hurdle of presenting "evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude." *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir.1992). Although *Ostrowski* squarely rejected a definition of "direct evidence" as non-circumstantial evidence, *id.* at 181, some cases quote it as though it supported the noncircumstantial requirement. *See, e.g., Cronquist v. City of Minneapolis*, 237 F.3d 920, 925 (8th Cir.2001). *Ostrowski* was an age discrimination case, but has been widely applied in the Title VII context, apparently without analysis of the difference in the statutes. *See, e.g., Light-*

*foot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir.1997).

In the Tenth Circuit, the court initially declined to impose a heightened "direct evidence" requirement, only to be ignored by a panel ruling six months later. *Compare Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 553 (10th Cir.1999) ("A mixed motive instruction is ... appropriate in any case where the evidence is sufficient to allow a trier to find both forbidden and permissible motives." (citation and internal quotation marks omitted)) *with Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir.1999) (imposing a "direct evidence" requirement as classically defined, and excluding "statements of personal opinion, even when reflecting a personal bias").

■ We believe that the best way out of this morass is a return to the language of the statute, which imposes no special requirement and does not reference "direct evidence." To the extent that courts are using "direct evidence" as a veiled excuse to substitute their own judgment for that of the jury, we reject that approach. In so doing, we follow the Second Circuit's *Tyler* case, 958 F.2d at 1184–85, the Eleventh Circuit's *Wright* case, 187 F.3d at 1301–02, the Tenth Circuit's approach in *Medlock*, 164 F.3d at 553, and the Eighth Circuit in *Schleiniger v. Des Moines Water Works*, 925 F.2d 1100, 1101 (8th Cir.1991). We also agree with other courts to the extent that they hold that non circumstantial evidence is not the magical threshold for Title VII liability. *See, e.g., Thomas*, 131 F.3d at 203 (collecting cases).

■ Put simply, the plaintiff in any Title VII case may establish a violation through a preponderance of evidence (whether direct or circumstantial)[4] that a

---

4. The general rule bears repeating: in proving a case, circumstantial evidence "is weighed on the same scale and laid before the jury in the same manner as direct evidence." *United States v. King*, 552 F.2d 833, 845 (9th Cir.1976) (citing *Holland v. United States*, 348

protected characteristic played "a motivating factor." Like the Supreme Court, "we think it generally undesirable, where holdings of the Court are not at issue, to dissect the sentences of the United States Reports as though they were the United States Code." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The "direct evidence" quagmire results from just such a misdirected inquiry, and we decline to be drawn in.

## D. THE FRAMEWORK FOR PROVING A TITLE VII VIOLATION

In addition to the confusion over "direct evidence," there has been considerable misunderstanding regarding the relationship among the *McDonnell Douglas* burden-shifting analysis (sometimes referred to as "pretext" analysis), which primarily applies to summary judgment proceedings, and the terms single-motive and mixed-motive, which primarily refer to the theory or theories by which the defendant opposes the plaintiff's claim of discrimination. The short answer is that all of these concepts coexist without conflict.

Caesars' argument in favor of a higher evidentiary burden is emblematic of the confusion. Caesars maintains that without special proof, "any plaintiff who is able to establish a prima facie showing in a pretext case would qualify for a mixed-motive instruction, conflating the two categories of cases." This argument mistakenly juxtaposes the pretrial *McDonnell Douglas*

legal framework and the "mixed-motive" characterization.

▮ To place *McDonnell Douglas* in perspective, it must be remembered that the current form of Title VII is the result of twenty-seven years of dynamic exchange between the Supreme Court and Congress, working toward a framework that provides a remedy for barriers of discrimination and inequality in the workplace. Early in the statute's history, the Supreme Court distinguished disparate impact claims under Title VII § 703(a)(2) from disparate treatment claims under § 703(a)(1). Civil Rights Act of 1964, Pub.L. No. 88–352, tit. VII, § 703(a). Disparate treatment claims require the plaintiff to prove that the employer acted with conscious intent to discriminate. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805–06, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (distinguishing *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)).

▮ *McDonnell Douglas* was the first in a series of cases dealing with the difficulties of proving intent to discriminate in a disparate treatment context. The Supreme Court detailed circumstances sufficient to support an inference of discrimination, the now-eponymous *McDonnell Douglas* "prima facie case and burden-shifting paradigm."[5] The Court recently reaffirmed that "the precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz*, 122 S.Ct. at 995

---

U.S. 121, 139–40, 75 S.Ct. 127, 99 L.Ed. 150 (1954)). In other words, "circumstantial evidence is not inherently less probative than direct evidence." *United States v. Cruz*, 536 F.2d 1264, 1266 (9th Cir.1976) (citation and internal quotation marks omitted).

5. This may be done by showing "(i) that he belongs to a racial minority; (ii) that he ap-

plied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.

(quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)). This legal proof structure is a tool to assist plaintiffs at the summary judgment stage so that they may reach trial.

As the Supreme Court elaborated a few years after *McDonnell Douglas,* the prima facie case "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089. Therefore, "we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Id.* (citation and internal quotation marks omitted). *Burdine* clarified, however, that the plaintiff need not rely on this presumption: "She may succeed ... either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. 1089.

Throughout these cases and those that followed, the court reaffirmed the canons of proof: the plaintiff retains the "ultimate burden of persuading the court that she has been the victim of intentional discrimination," *id.* at 256, 101 S.Ct. 1089; the question comes down to whether she has made her case. *See also Hicks,* 509 U.S. at 511, 113 S.Ct. 2742; *Reeves,* 530 U.S. at 142–49, 120 S.Ct. 2097.

 The plaintiff may make out a prima facie case—which may, admittedly, be a weak showing—that entitles her to a commensurately small benefit, a transitory presumption of discrimination: the burden of *production* only shifts briefly to the employer to explain why it took the challenged action, if not based on the protected characteristic. In practice, employers quickly rebut the presumption and it "drops from the case." *Burdine,* 450 U.S. at 256 n. 10, 101 S.Ct. 1089; *see also* Deborah C. Malamud, *The Last Minuet: Disparate Treatment after Hicks,* 93 Mich. L.Rev. 2229, 2302–04 (1995). The burden of production then shifts back to the plaintiff to introduce evidence from which the factfinder could conclude that the employer's proffered reason was pretextual. The burden of *persuasion* always remains with the employee to prove the ultimate Title VII violation—unlawful discrimination.

 It is important to emphasize, however, that nothing compels the parties to invoke the *McDonnell Douglas* presumption. *United States Postal Serv. Bd. v. Aikens,* 460 U.S. 711, 717, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). Evidence can be in the form of the *McDonnell Douglas* prima facie case, or other sufficient evidence—direct or circumstantial—of discriminatory intent. *Id.* at 714 & n. 3, 717, 103 S.Ct. 1478. Thus, although *McDonnell Douglas* may be used where a single motive is at issue, this proof scheme is not the exclusive means of proof in such a case. Indeed, it also might be invoked in cases in which the defendant asserts a "same decision" defense to certain remedies, a circumstance in which mixed motives are at issue.

 Regardless of the method chosen to arrive at trial, it is not normally appropriate to introduce the *McDonnell Douglas* burden-shifting framework to the jury.[6] At that stage, the framework "unnecessarily evade[s] the ultimate question

---

6. The presumption is thus what has been termed a "bursting bubble" presumption. In one limited circumstance, the presumption retains vitality at trial: where there is no rebuttal by the employer, but the plaintiff's prima facie case is in factual dispute. The jury then determines whether the prima facie case is established. If it is, the jury must find discrimination. *Hicks,* 509 U.S. at 509–10, 113 S.Ct. 2742.

of discrimination *vel non.*" *Aikens*, 460 U.S. at 714, 103 S.Ct. 1478.

 Once at the trial stage, the plaintiff is required to put forward evidence of discrimination "because of" a protected characteristic.[7] After hearing both parties' evidence, the district court must decide what legal conclusions the evidence could reasonably support and instruct the jury accordingly. This determination is distinct from the question of whether to invoke the *McDonnell Douglas* presumption, which occurs at a separate, earlier stage of proceedings, involves summary judgment rather than jury instructions, and is unrelated to the number of possible motives for the challenged action. Instead, the choice of jury instructions depends simply on a determination of whether the evidence supports a finding that just one—or more than one-factor actually motivated the challenged decision. Justice White, in his concurring opinion in *Price Waterhouse*, succinctly described how the type of evidence presented affects the question facing the jury:

> In [single-motive] cases, "the issue is whether either illegal or legal motives, but not both, were the 'true' motives behind the decision." In mixed-motive cases, however, there is no one "true" motive behind the decision. Instead, the decision is a result of multiple factors, at least one of which is legitimate.

*Price Waterhouse*, 490 U.S. at 260, 109 S.Ct. 1775 (White, J., concurring in the judgment) (citation omitted).[8] Following the 1991 amendments, characterizing the

evidence as mixed-motive instead of single-motive results only in the availability of a different defense, a difference which derives directly from the statutory text, not from judicially created proof structures.

As a practical matter, the question of how many motives the evidence reasonably supports affects the jury instructions as follows:

 If, based on the evidence, the trial court determines that the only reasonable conclusion a jury could reach is that discriminatory animus is the *sole* cause for the challenged employment action or that discrimination played *no* role at all in the employer's decisionmaking, then the jury should be instructed to determine whether the challenged action was taken "because of" the prohibited reason. 42 U.S.C. § 2000e 2(a); *see also Oncale*, 523 U.S. at 79–80, 118 S.Ct. 998 (emphasizing "because of" standard). If the jury determines that the employer acted because of discriminatory intent, the employee prevails and may receive the full remedies available under Title VII; if not, the employer prevails. In such cases the employer does not benefit from the "same decision" defense, which, if successful, significantly limits the employee's remedies.

 In contrast, in cases in which the evidence could support a finding that discrimination is one of two or more reasons for the challenged decision, at least one of which may be legitimate, the jury should be instructed to determine first whether the discriminatory reason was "a

---

7. As the Supreme Court has observed, a case need not be characterized or labeled at the outset. Rather, the shape will often emerge after discovery or even at trial. Similarly, the complaint itself need not contain more than the allegation that the adverse employment action was taken because of a protected characteristic. *See Price Waterhouse*, 490 U.S. at 247 n. 12, 109 S.Ct. 1775 (plurality opinion).

8. Although Justice White used the term "pretext cases" in the first sentence of this passage, it is clear from the context that he was referring to single-motive cases, including those involving pretext. *Id.* at 260, 109 S.Ct. 1775.

motivating factor" in the challenged action. If the jury's answer to this question is in the affirmative, then the employer has violated Title VII. However, if the jury then finds that the employer has proved the "same decision" affirmative defense by a preponderance of the evidence, 42 U.S.C. § 2000e–5(g)(2)(B), the employer will escape the imposition of damages and any order of reinstatement, hiring, promotion, and the like, and is liable solely for attorney's fees, declaratory relief, and an order prohibiting future discriminatory actions.

■ Regardless of what kind of instructions are given, we emphasize that there are not two fundamentally different types of Title VII cases. In some cases, the employer may be entitled to the "same decision" affirmative defense instruction. In others, it may not. The employee's ultimate burden of proof in all cases remains the same: to show by a preponderance of the evidence that the challenged employment decision was "because of" discrimination.

Finally, we turn to the question of where the concept of pretext fits in this framework. Although cases in which the *McDonnell Douglas* framework is applied are sometimes referred to as "pretext cases," and we have no wish to change a quarter century of usage, it should be noted that questions of pretext may arise in any Title VII case, regardless of whether it is analyzed under *McDonnell Douglas*. Cases in which the dispute is only over whether or not the employer possessed the discriminatory motive alleged need not involve pretext, although they often do. For example, if the plaintiff chooses not to invoke the *McDonnell Douglas* framework, the employer need not proffer any explanation for the challenged action, but may simply require the plaintiff to prove her case of discrimination. Nor is the concept of pretext alien to cases in which

an employer asserts a "same decision" or "but for" defense. For example, one of the employer's purportedly legitimate reasons may be pretextual. On the other hand, another may not. As Justice O'Connor recently explained in writing for the Court: "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination ...." *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097.

■ To summarize: *McDonnell Douglas* and "mixed-motive" are not two opposing types of cases. Rather, they are separate inquiries that occur at separate stages of the litigation. Nor are "single-motive" and "mixed-motive" cases fundamentally different categories of cases. Both require the employee to prove discrimination; they simply reflect the type of evidence offered. Where the employer asserts that, even if the factfinder determines that a discriminatory motive exists, the employer would in any event have taken the adverse employment action for other reasons, it may take advantage of the "same decision" affirmative defense. The remedies will differ if the employer prevails on that defense. With this framework in mind, we turn to the evidence in Costa's case.

## II. Mixed Motive Instruction And Sufficiency Of The Evidence

Although Caesars invokes the *McDonnell Douglas* analysis, that framework is not instructive at this stage of the case. *See Aikens*, 460 U.S. at 713–14, 103 S.Ct. 1478. Rather, we are asked to review the district court's decision to give a mixed-motive instruction and the sufficiency of the evidence to support the jury's verdict, as challenged in a motion for judgment as a matter of law made at the close of the evidence.

## A. The Mixed Motive Jury Instruction

We must first determine the applicable standard of review. The standards are well known and often stated: we generally review the formulation of instructions for abuse of discretion, but whether an instruction misstates the law is a legal issue reviewed de novo. *See, e.g., Voohries–Larson v. Cessna Aircraft Co.,* 241 F.3d 707, 713 (9th Cir.2001). At issue here is whether the evidence can be characterized as establishing multiple motives, and thus warranting the affirmative defense. Because this evaluation is, at bottom, an evaluation of the evidence, an abuse of discretion standard is appropriate.

The district court submitted both claims-the termination and the conditions of employment—to the jury. It first instructed the jury that:

> The plaintiff has the burden of proving each of the following by a preponderance of the evidence:
>
> 1. Costa suffered adverse work conditions, and
> 2. Costa's gender was a motivating factor in any such work conditions imposed upon her. Gender refers to the quality of being male or female.
>
> If you find that each of these things has been proved against a defendant, your verdict should be for the plaintiff and against the defendant. On the other hand, if any of these things has not been proved against a defendant, your verdict should be for the defendant.

The jury was next given the following mixed-motive instruction, which is central to this appeal:

> You have heard evidence that the defendant's treatment of the plaintiff was motivated by the plaintiff's sex and also by other lawful reasons. If you find that the plaintiff's sex was a motivating factor in the defendant's treatment of the plaintiff, the plaintiff is entitled to your verdict, even if you find that the defendant's conduct was also motivated by a lawful reason.
>
> However, if you find that the defendant's treatment of the plaintiff was motivated by both gender and lawful reasons, you must decide whether the plaintiff is entitled to damages. The plaintiff is entitled to damages unless the defendant proves by a preponderance of the evidence that the defendant would have treated plaintiff similarly even if the plaintiff's gender had played no role in the employment decision.

Caesars first intimates that the wording of the mixed motive instruction was invalid because it inappropriately implied a judicial determination that sex was in fact a motivation for the challenged treatment. Caesars, however, waived any objection to the form of the instruction by conceding at trial that it was "a reasonable statement of the mixed motive instruction." Fed. R.Civ.P. 51; *Shaw v. City of Sacramento,* 250 F.3d 1289, 1293 (9th Cir.2001) (as amended).

As for Caesars' main contention, we are not persuaded that the district court erred in giving a mixed-motive instruction. In many respects, Costa's case presents a typical Title VII case in which a plaintiff alleges that she was discharged or disciplined for a discriminatory reason and the employer counters that the reason for its action was entirely different. The evidence did not require the jury to believe that discrimination was the only motive, nor that Caesars' stated reasons were all bogus or pretextual. For example, there was evidence that Hallett, Stewart, and other decisionmakers were legitimately concerned about Costa's behavior and altercations with co-workers, but there was likewise significant evidence that they

would not have taken such drastic disciplinary measures against a man. Similarly, the jury could reasonably have concluded that the overtime assignment system was in a state of disarray that allowed favoritism and that one element of that favoritism was preferential treatment for male workers. The fact is that Caesars may have had legitimate reasons to terminate Costa. Indeed, unlike in many Title VII cases, Costa does not dispute many of the events that took place. Nor does she wholly discount that these events may have been part of the basis for her discipline and termination. Nonetheless, the wide array of discriminatory treatment is sufficient to support a conclusion that sex was also a motivating factor in the decision-making process. Thus, the district court did not abuse its discretion in giving a mixed-motive instruction.

## B. SUFFICIENCY OF THE EVIDENCE

■■■■■ We review de novo Caesars' challenge to the district court's denial of its Rule 50(b) motion for judgment as a matter of law. *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1226 (9th Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 645, 151 L.Ed.2d 563 (2001). At the outset, we note that the standard that Caesars must meet is very high. We can overturn the jury's verdict and grant such a motion only if " 'there is no legally sufficient basis for a reasonable jury to find for that party on that issue.' " *Reeves*, 530 U.S. at 149, 120 S.Ct. 2097 (quoting Fed. R.Civ.P. 50(a)). Because we "may not substitute [our] view of the evidence for that of the jury," *Johnson*, 251 F.3d at 1227, we neither make credibility determinations nor weigh the evidence and we must draw all inferences in favor of Costa, *Reeves*, 530 U.S. at 150, 120 S.Ct. 2097 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Supreme Court cautions us

to "disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151, 120 S.Ct. 2097. This high hurdle recognizes that credibility, inferences, and factfinding are the province of the jury, not this court.

### 1. LIABILITY DETERMINATION

■■■ Applying the analysis outlined above, we begin, not surprisingly, with the text of the statute, asking whether a reasonable jury could conclude that sex was "a motivating factor" in the challenged actions. The discriminatory treatment ran the gamut from disparate discipline and "stacking" Costa's personnel file to stalking her, singling her out for different treatment in the workplace, and discriminating against her in the assignment of overtime. In the final analysis, the jury heard testimony from Costa and fifteen other witnesses. Testimony included the chronology of escalating discipline and targeting of Costa, co-workers who identified discrimination because of sex, and multiple examples of disparate treatment purposefully directed at Costa because of her sex. Lending credence to the claim that sex was a motivating factor in her treatment, Costa also offered evidence of sexual stereotyping and sexual epithets. Viewing the evidence from her perspective and drawing all inferences in her favor, we cannot conclude that "there is no legally sufficient evidentiary basis for a reasonable jury," *Reeves*, 530 U.S. at 135, 149, 120 S.Ct. 2097, to find that intentional discrimination on the basis of sex was "a motivating factor" in subjecting Costa to a number of adverse employment actions, and culminating in her termination.

Costa presents overwhelming evidence that she was more harshly treated than her male coworkers. Because she was the only woman in an otherwise all-male unit, linking the differential treatment to her

sex was not a difficult leap. The jury could easily infer that sex was one of the reasons Costa was singled out for negative treatment. Indeed, the evidence is sufficiently strong that for many of the incidents the jury might have concluded that sex was the only reason for the adverse action. "Proof of discriminatory motive ... can in some situations be inferred from the mere fact of differences in treatment." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Mindful of the Supreme Court's admonishment to "draw all reasonable inferences in favor of" the prevailing party, *Reeves*, 530 U.S. at 151–52, 120 S.Ct. 2097, we conclude that the jury was entitled to view the differential treatment here as evidence of discrimination.

In a case quite similar to this one, *Sischo–Nounejad v. Merced Community College District*, 934 F.2d 1104, 1112 (9th Cir. 1991), we held that a plaintiff had made a showing sufficient to create a factual issue. The plaintiff there, the only woman holding a full-time faculty appointment in the art department of a community college, alleged that she was denied a choice as to which courses to teach and that she was deprived of supplies, whereas male co-workers were not. The college was also nonresponsive to reasonable requests for leave and disciplined her for petty offenses. *Id.* at 1107–08. Similarly, Costa presented evidence that she was denied overtime and medical leave where male co-workers were not. Her work was supervised more intensely than that of male colleagues. She was reprimanded for minor infractions while men, sitting right next to her and engaging in the same conduct, were not. Thus, this is a case where "the employer's conduct carries with it an inference of unlawful intention so compelling that it is justifiable to disbelieve the employer's protestations of inno-

cent purpose." *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 311–12, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965) ("[W]here many have broken a shop rule, but only union leaders have been discharged, the Board need not listen too long to the plea that shop discipline was simply being enforced.").

The most prominent example of this differential treatment was Caesars' decision to terminate Costa for an incident that netted her male co-worker only a five-day suspension. Costa's claim that she was shoved against an elevator wall and sustained bruises from the altercation is not one to be taken lightly. The excuse that the management could not figure out whom to believe—Costa or Gerber—is questionable given the strong corroboration of Costa's story and the inconsistencies in Gerber's account. The explanation offered by Caesars was lacking in several respects, and the jury was certainly not required to believe it. The jury was entitled instead to infer that Costa was fired, while Gerber was only suspended, because Costa was a woman. This is precisely the circumstance in which we credit the inference in Costa's favor.

Finally, the jury could easily have believed that Costa's record was itself largely a result of discrimination because of repeated incidents of unfair discipline that accumulated over time. For example, her supervisor's decision to backfill the records with prior alleged misconduct supports such a conclusion. *See Pogue v. United States Dep't of Labor*, 940 F.2d 1287, 1291 (9th Cir.1991). In *Pogue*, we held that the Department of Labor acted, at least in part, with impermissible retaliatory motives, because the employee's "prior work performance and defiant attitude cited by the Secretary could reasonably be attributed to the Navy's admitted retaliation." *Id.* Moreover, "Pogue presented evidence,

relied on by the ALJ, that the disciplinary actions taken against her were substantially disproportionate to discipline imposed by the Navy in the past." *Id.*

Caesars presents us with alternate rationales for the termination, and asks us to hold as a matter of law that Costa's conduct was the only element motivating its decision. We decline this invitation. Perhaps the disparities in how Costa was treated were in part because supervisor Hallett disliked her as a person and not as a woman. Perhaps they were in part because Costa had a history of "not getting along" with her co-workers, although there was contrary testimony. What the jury implicitly concluded, however, was that the disparities were also in part because she was a woman. In so finding, the jury did not necessarily reject all of Caesars' legitimate complaints about Costa. But even if it credited certain of these explanations, in following the jury instructions, it reasonably found that sex was "a motivating factor" in the termination. The evidence of differential treatment was so persuasive and longstanding that the judgment may be upheld on this ground alone. "[I]t is primarily the province of the jury to determine what inferences can be drawn from circumstantial evidence. So long as the evidence can reasonably support an inference of discrimination, the court should not upset the jury's decision." *Norton v. Sam's Club,* 145 F.3d 114, 119 (2d Cir. 1998).

We turn next to Costa's evidence that she was chastised for failing to conform to the role stereotypically assigned to women. The jury heard remarks that could reasonably be viewed to "stem[ ] from an impermissibly cabined view of the proper behavior of women." *Price Waterhouse,* 490 U.S. at 236–37, 109 S.Ct. 1775. She was told that she did not deserve overtime because she did not have a family to sup-

port. In her view, the implication was that she was not *a man* with a family to support. The jury could interpret this as a comment directed to her as a woman, indicating that the discriminatory action, a failure to assign overtime, was based on her not being a male breadwinner. The Seventh Circuit held similar facts to be evidence of sex stereotyping. *See Bruno v. City of Crown Point,* 950 F.2d 355, 362 (7th Cir.1991) (holding that jury could believe employer held sexual stereotypes when female paramedic applicant was the only one asked about family responsibilities).

She was also disciplined in circumstances that the jury could reasonably infer amounted to telling her to "walk more femininely, talk more femininely." *Price Waterhouse,* 490 U.S. at 235, 109 S.Ct. 1775. For example, Costa was told "[y]ou got more balls than the guys." And yet, arguably when she acted tough like the guys, she received harsher discipline rather than an "atta boy" reinforcement. At trial, Caesars' consistent objection to Costa as an employee was that she was "strong-willed" and "opinionated," a view that the jury could have reasonably interpreted as gender stereotyping. As was clear from her testimony, Costa sought no special treatment, only equal treatment.

■ Finally, reinforcing the inference that her gender motivated the adverse view of her character, Costa presented evidence of sexual language and epithets directed to her. Specifically, Costa presented evidence that Hallett, the very supervisor who signed her discharge, had declared an intention on several occasions to "get rid of that bitch." Whether this term is part of the everyday give-and-take of a warehouse environment or is inherently offensive is not for us to say. Instead, we simply conclude that the jury could interpret it here to be one piece of evi-

dence among many, a derogatory term indicating sex-based hostility.[9] In addition, managers encouraged sex-based epithets directed at Costa by disciplining her for failing to tolerate the slurs silently. Admittedly, Costa worked in a rough and tumble and often vulgar environment. But the prevalence of race or sex-based slurs does not excuse them. *See Swinton v. Potomac Corp.*, 270 F.3d 794, 807 (9th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 1609, 152 L.Ed.2d 623 (2002).

■ As we explained in *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463–64 (9th Cir.1994), when abuse directed at women "center[s] on the fact that they[are] females," a jury may infer discrimination. In *Steiner*, a hostile environment case, a supervisor "was indeed abusive to men, but ... his abuse of women was different. It relied on sexual epithets, offensive, explicit references to women's bodies and sexual conduct." *Id.* at 1463 (citing *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 19, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Similarly here, the evidence supports the inference that the abuse directed toward Costa was different in nature and degree.

In the context of this case, we need not decide whether this sexual language is dispositive of discrimination. Rather, this language was simply one more factor for the jury to consider in the face of repeated differential treatment by Hallett and others at Caesars. Viewing the evidence in Costa's favor, the jury could have easily

inferred that the use of highly charged and offensive sexual language was simply another means of singling Costa out because she was a woman.

Finally, we detour briefly to address the suggestion that Hallett was somehow incapable of discriminating against Costa because Hallett was herself a woman. This argument was resoundingly rejected by a unanimous Supreme Court in *Oncale*, 523 U.S. at 80–81, 118 S.Ct. 998. In a society where historically discriminatory attitudes about women are "firmly rooted in our national consciousness," *Frontiero v. Richardson*, 411 U.S. 677, 684, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (plurality opinion), we cannot discount that the jury perceived Hallett, a former Army officer now placed in a supervisory position in a virtually male-only world, as demonstrating hostility toward Costa as a woman as a means of showing that she was "one of the boys." *See also J.E.B. v. Alabama ex rel T.B.*, 511 U.S. 127, 136–37, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) ("[O]ur nation has had a long and unfortunate history of sex discrimination ....") (quoting *Frontiero*, 411 U.S. at 684, 93 S.Ct. 1764). Life was not necessarily easy for Hallett, but that was no excuse for visiting harsh discipline on Costa.

### 2. AFFIRMATIVE DEFENSE—"SAME DECISION"

■ Once the jury found liability on the part of Caesars, it was asked to decide whether the "defendant proved by a pre-

---

9. *See Galloway v. Gen'l Motors Serv. Parts Operations*, 78 F.3d 1164, 1168 (7th Cir.1996) (holding that the legal meaning of the word "bitch" is context-specific; "The word 'bitch' is sometimes used as a label for women who possess such 'woman faults' as 'ill-temper ...,' and latterly as a label for women considered by some men to be too aggressive or careerist." (citation omitted)), *overruled in part on other grounds by Nat'l R.R. Passenger*

*Corp. v. Morgan*, —— U.S. ——, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *Kriss v. Sprint Communications Co.*, 58 F.3d 1276, 1281 (8th Cir.1995) (noting that use of the word "bitch" might be evidence of discrimination in some contexts); *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1513 (D.C.Cir.1995) ("[T]his pejorative term may support an inference that an employment decision is discriminatory under different circumstances ....").

ponderance of the evidence that the defendant would have made the same decisions if the plaintiff's gender had played no role in the employment decision." The jury checked the "NO" box. This question on the special verdict form reflects the "same decision" affirmative defense provided in 42 U.S.C.2000e–5(g)(2)(B); *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 759–60 (9th Cir.1996).

Caesars, not Costa, has the burden on this question, and we must still filter the evidence in the light most favorable to Costa. Under this lens, much of the evidence of differential treatment removes this question from the realm of the hypothetical and shows what, in fact, Caesars did do when men violated its policies. Costa's infractions may have played a role in her termination. But the evidence also underscores how the documentation of her infractions and discipline stemmed in part from sex discrimination. Based on the extensive testimony, the jury simply did not believe that Caesars would have made the same decision "but for" Costa's sex. There was a substantial basis for the jury to conclude that Caesars did not meet its burden in demonstrating that it would have made the same decision absent consideration of sex.

## III. ADMISSIBILITY OF ARBITRATION DECISIONS

Caesars argues that the trial court's exclusion of arbitration decisions, relating to the incident that ultimately triggered Costa's termination, was an abuse of discretion so prejudicial that a new trial is warranted. The incident that led to Costa's termination was the altercation with Gerber in the elevator. In an arbitration brought pursuant to their collective bargaining agreement, both Costa and Gerber challenged the discipline imposed, to no avail. At the discrimination

trial, having successfully argued that hearsay rules blocked Costa's attempt to introduce transcripts of the arbitration hearing, Caesars later sought to introduce the arbitrator's decisions. Costa responded by raising a hearsay objection and arguing that admission of the decisions would be irrelevant because the central issue of the trial—sex discrimination—was not addressed in the arbitration.

Costa is correct that discrimination was not covered by the collective bargaining agreement and was not at issue in the arbitration. Thus, the present case can be distinguished from *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 38, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), in which the Supreme Court established an employee's right to pursue both Title VII judicial remedies and arbitration "under the nondiscrimination clause of a collective-bargaining agreement." Because we review for abuse of discretion the narrow evidentiary issue before us, we need not address the scope of *Gardner–Denver* or broader issues with respect to the preclusive effects of arbitration on subsequent discrimination claims. *See, e.g., Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 35, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). Other courts have held that district courts have discretion to exclude arbitration awards in similar circumstances. *See, e.g. Jackson v. Bunge Corp.*, 40 F.3d 239, 246 (7th Cir. 1994); *McAlester v. United Air Lines, Inc.*, 851 F.2d 1249, 1259 (10th Cir.1988); *Perry v. Larson*, 794 F.2d 279, 284–85 (7th Cir.1986). Under these circumstances, it was not an abuse of discretion for the district court to exclude the arbitration decisions. *See United States v. Hernandez–Herrera*, 273 F.3d 1213, 1217 (9th Cir. 2001) (standard of review).

## IV. PUNITIVE DAMAGES

The jury awarded $100,000 in punitive damages, in addition to the $200,000 in

compensatory damages (later remitted to $100,000) and $64,377.74 in backpay. Caesars argues that the jury instruction on punitive damages, though a proper statement of Ninth Circuit law at the time of trial, was in fact in error under the Supreme Court's later ruling in *Kolstad v. American Dental Association*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). We agree and accordingly remand for consideration of punitive damages.

We have explained that *Kolstad* provided the employer with a new "good faith" defense, enabling it to escape punitive damages if it can show that the challenged actions were not taken by senior managers and were contrary to the employer's good faith implementation of an effective anti-discrimination policy. *Swinton*, 270 F.3d at 810–11; *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 516 (9th Cir.2000). *Kolstad* also suggests that " 'the court should review the type of authority that the employer has given to the employee, the amount of discretion that the employee has in what is done and how it is accomplished.' " 527 U.S. at 543, 119 S.Ct. 2118 (quoting 1 L. Schlueter & K. Redden, Punitive Damages § 4.4(B)(2)(a), p. 181 (3d ed.1995)). Understandably, in view of the then-current Ninth Circuit authority, the instructions

here contained no such considerations, nor were these issues considered by the district court.[10]

 Initially, we must determine whether Caesars waived the objection to the form of the instruction by failing to raise it at trial. We have discretion to review an instruction despite such a failure to object where a " 'solid wall of Circuit authority' would have rendered an objection futile." *Knapp v. Ernst & Whinney*, 90 F.3d 1431, 1438–39 (9th Cir. 1996) (quoting *Robinson v. Heilman*, 563 F.2d 1304, 1307 (9th Cir.1977) (per curiam)). Consistent with our prior cases in this transitional period, we believe that review is appropriate to determine whether the jury instructions comported with the Supreme Court's command in *Kolstad*. *See Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1291 (9th Cir.2001); *Swinton*, 270 F.3d at 809–10; *Passantino*, 212 F.3d at 514.

 Both parties seek to avoid a remand on the punitive damages issue. Costa argues that the jury's finding of egregious conduct obviates the need to determine good faith; Caesars argues that punitive damages are unavailable as a matter of law. Neither argument prevails. The jury found the conduct "egregious" or re-

---

**10.** Caesars objected to Instruction Number 15, which was a general vicarious liability instruction:

> A corporation such as Caesars Palace acts through its management and it is responsible for the decisions and actions of its management and supervisory personnel in matters of this kind.

Instruction Number 13 related to punitive damages and read, in relevant part:

> If you find for plaintiff and if you award compensatory damages or nominal damages, you may, but are not required to, award punitive damages. The purposes of punitive damages are to punish a defendant and to deter a defendant and others from committing similar acts in the future.

> Plaintiff has the burden of proving that punitive damages should be awarded, and the amount, by a preponderance of the evidence. You may award punitive damages only if you find that Plaintiff has made a showing beyond the threshold level of intent required for compensatory damages. An award of punitive damages is proper where defendant's illegal acts were willful and egregious, or displayed reckless disregard to plaintiff's rights. Conduct is in reckless disregard of plaintiff's rights if, under the circumstances, it reflects complete indifference to the safety and rights of others.

flective of "complete indifference to the safety and rights of others." *Kolstad* held that "egregious" misconduct was probative but not necessary for an award of punitive damages. 527 U.S. at 538, 119 S.Ct. 2118. Instead, the question was the employer's "malice" or "reckless indifference" to the employee's federally protected rights. *Id.* at 535–36, 119 S.Ct. 2118. The jury's findings, which were well-supported, establish this requisite scienter and the additional, probative factor of egregious misconduct. However, we cannot equate "egregious" misconduct with a lack of "good faith" as a matter of law. Nor can we say that punitive damages are unavailable as a matter of law. We therefore remand for a retrial on the issue of punitive damages in light of *Kolstad.*

**AFFIRMED** in part; **REVERSED** and **REMANDED** in part. Each party to bear its own costs on appeal.

GOULD, Circuit Judge, with whom KOZINSKI, FERNANDEZ, and KLEINFELD, Circuit Judges, join, dissenting:

I respectfully dissent because the majority does not follow the Supreme Court's holding in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), in Title VII mixed motives cases. The majority's analysis is not persuasive and should be corrected because it disregards the holding of *Hopkins* that is reflected in Justice O'Connor's concurring opinion.

In *Hopkins,* the plurality, comprised of four Justices, concluded that an employee should be able to recover under Title VII if gender was "a factor in the employment decision at the moment it was made," *id.* at 241, 109 S.Ct. 1775, unless the employer, using objective evidence, could show by a preponderance of the evidence that it would have made the same decision absent the discriminatory motive. *Id.* at 244–45, 252, 109 S.Ct. 1775.

Justice White, joined by Justice O'Connor, concurred in the judgment. Justice White thought that the impermissible motive must have been a "substantial factor" in the employer's decision and that the employer need not use "objective evidence" to make its same-decision showing. *Id.* at 259, 261, 109 S.Ct. 1775. Justice White would permit a mixed motive test in which the burden is shifted to the employer, but he would be liberal on the evidence an employer could offer. His view of when such a test should be available, however, is broader than Justice O'Connor's.

Justice O'Connor would allow a plaintiff to use a mixed motive test only in narrow circumstances. In concurrence, Justice O'Connor held that she would require a Title VII plaintiff in a mixed motive case to produce "direct evidence" showing that "decisionmakers placed substantial negative reliance on [the] illegitimate criterion," *id.* at 277, 109 S.Ct. 1775.

I do not point to Justice O'Connor's concurring opinion merely to admire its common sense, though that is admirable. Rather, we must heed the direct evidence rule of *Hopkins* as controlling, and we may not diminish it, in the majority's terms, as a "passing reference." Justice O'Connor's concurring opinion in *Hopkins,* which in considered language required the use of direct evidence to prove a mixed motive case, must be viewed as the holding of the Court, under the rule of *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds

...." ) (citation and internal quotation marks omitted).

Because Justice O'Connor would permit the use of the mixed motives test only when direct evidence is present, Justice O'Connor "concurred in the judgment on the narrowest grounds," *see Marks* 430 U.S. at 193, 97 S.Ct. 990, and her concurrence is to be considered the holding of *Hopkins* under the rule described in *Marks*. The view that Justice O'Connor's opinion is the holding in *Hopkins* is supported by Congress' actions in amending Title VII in 1991, by the holdings of other circuits on the issue, and by sound policy.

The 1991 amendments to Title VII did not modify the Supreme Court's prior holding on the need for direct evidence. Subsection (m) of 42 U.S.C. § 2000e–2, which incorporates the premise of *Hopkins* that discrimination can be shown in a mixed motive case so long as it is one factor, was enacted two years after *Hopkins:*

> Except as otherwise provided in this subchapter [42 U.S.C. §§ 2000e *et seq.*], an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

42 U.S.C. § 2000e–2(m). Though Congress responded to other aspects of the Court's holding in *Hopkins,* specifically the holding that an employer could completely avoid liability if it could show that it would have made the same decision absent the discriminatory motive, *see* 42 U.S.C. § 2000e–5(g)(2); *Fuller v. Phipps,* 67 F.3d 1137, 1142 (4th Cir.1995), Congress, in amending Title VII, did not respond at all to Justice O'Connor's direct evidence requirement, which had already been

adopted by several circuit courts. Instead, the statutory amendments are silent as to that subject, neither praising nor condemning, neither adopting nor rejecting, and clearly not modifying Justice O'Connor's test, which is properly viewed as the holding of *Hopkins.* This silence indicates that Congress left undisturbed Justice O'Connor's holding and the prior circuit decisions that adhered to it. As we remain bound by the Supreme Court's precedent, we must follow the direct evidence rule as explained in Justice O'Connor's concurrence.

By vitiating Justice O'Connor's direct evidence requirement, the majority's holding puts our circuit in conflict with almost all others. *See Jackson v. Harvard Univ.,* 900 F.2d 464, 467 (1st Cir.1990); *Ostrowski v. Atl. Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir.1992); *Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089, 1096 (3d Cir. 1995); *Fuller v. Phipps,* 67 F.3d 1137, 1142 (4th Cir.1995); *Brown v. E. Miss. Elec. Power Ass'n,* 989 F.2d 858, 861 (5th Cir.1993); *Wilson v. Firestone Tire & Rubber Co.,* 932 F.2d 510, 514 (6th Cir. 1991); *Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 347 (7th Cir.1997); *Schleiniger v. Des Moines Water Works,* 925 F.2d 1100, 1101 (8th Cir.1991); *Heim v. Utah,* 8 F.3d 1541, 1547 (10th Cir.1993); *E.E.O.C. v. Alton Packaging Corp.,* 901 F.2d 920, 923 (11th Cir.1990). As suggested in the decision of the three-judge panel in *Costa,* and as reflected in the cases cited above, these circuits have correctly viewed Justice O'Connor's opinion in *Hopkins* as the holding of the Court and have followed it on that basis. *See Costa v. Desert Palace, Inc.,* 268 F.3d 882, 886–88 (9th Cir.2001), *vacated by* 274 F.3d 1306 (9th Cir.2001). I agree with the other circuits and with the reasoning of the prior opinion of the three-judge panel in *Costa,* which I adopt because it is faithful to precedent.[1] We

---

**1.** The three-judge panel held that:

Even if Costa's evidence of differential

should not rush to join a decision that turns its back on our colleagues' wisdom and engages our circuit in a fanciful frolic of its own.

Finally, apart from our duty to abide by precedent, policy concerns favor adhering to Justice O'Connor's view of mixed motives analysis. Mixed motives analysis is a departure from the well-established *McDonnell Douglas* framework. Whereas *McDonnell Douglas* requires the plaintiff to make a pretext showing once an employer puts forth evidence of legitimate nondiscriminatory reasons for the challenged employment practice, mixed motive analysis allows a plaintiff to prevail even when she cannot prove pretext.

To keep the mixed motive framework from overriding in all cases the *McDonnell Douglas* rule and the pretext requirement, which it clearly was not meant to do, mixed motive analysis properly is available only in a special subset of cases. Justice O'Connor's direct evidence requirement meets this need: It requires the plaintiff to produce highly probative, direct evidence, before she may utilize the more lenient, mixed motives test. As a practical matter, without this or some similar constraint on when a plaintiff may invoke the mixed motives test, any plaintiff would opt for the *Hopkins* framework to avoid having to show pretext. The Supreme Court's seminal opinion in *McDonnell Douglas* would be effectively overruled by an incorrect interpretation of *Hopkins* that jettisons the direct evidence requirement, an effect that could not have been intended in *Hopkins* and an effect that will create uncertainty in our settled law.

Taken with the idea that plaintiff, an unsatisfactory employee, is a "trailblazer," the majority departs from the path of precedent and blazes its own trail beyond the frontiers of settled law into regions of error. I respectfully dissent.

treatment were found to raise an inference of discrimination, it does not "prove that her gender played a motivating part in an employment decision." *Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (plurality opinion); *see also id.* at 280, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (O'Connor, J., concurring) ("I read [today's decision] as establishing that in a limited number of cases Title VII plaintiffs, by presenting direct and substantial evidence of discriminatory animus, may shift the burden of persuasion to the defendant to show that an adverse employment decision would have been supported by legitimate reasons."). Costa's case comes down to the fact that she was the only woman in her workplace and that in some instances she was treated less favorably than her male coworkers. But she has failed to produce evidence that she was treated differently *because* she was a woman—"direct and substantial evidence of discriminatory animus." Accordingly, the district court erred in giving the jury a mixed-motive instruction. Because the court's instructions shifted the burden of proof to Caesars, the error was not harmless. *See Caballero v. City of Concord,* 956 F.2d 204, 206 (9th Cir.1992). Caesars was prejudiced, moreover, by the court's instruction that the jury had "heard evidence that the defendant's treatment of the plaintiff was motivated by the plaintiff's sex," a statement not supported by the record. Accordingly, the judgment must be vacated. *Costa,* 268 F.3d at 889–90 (footnotes omitted).